**TEMPLE UNIVERSITY HOSPITAL, INC., Appellant,**

v.

**HEALTHCARE MANAGEMENT ALTERNATIVES, INC. a/k/a HMA, Healthpass.**

Superior Court of Pennsylvania.

Argued Jan. 11, 2000.
Filed Dec. 13, 2000.

Matthew M. Strickler, Philadelphia, for appellant.

Manuel del Valle, Philadelphia, for appellee.

Before FORD ELLIOTT, STEVENS and MONTEMURO,* JJ.

FORD ELLIOTT, J.:

¶ 1 This case, although seemingly complicated, asks us merely to decide whether the trial court erred when it found that the parties entered into an enforceable contract by performance after their written contract expired. Because we find that the trial court did, in fact, err, we reverse and remand. The history leading up to this contract dispute follows.

¶ 2 Appellant Temple University Hospital, Inc. ("Hospital") is a teaching hospital located in north Philadelphia, which has historically provided care to indigent individuals despite their inability to pay for care. Many of Hospital's patients are eligible for Medicaid benefits under a program operated by the Pennsylvania Department of Public Welfare ("DPW") and funded jointly by the Commonwealth and the federal government.

¶ 3 Federal law governing Medicaid programs "authorizes the states to develop their own Medicaid reimbursement standards and methodologies for payment of hospital services, but subjects those standards and methodologies to three general federal requirements." *West Virginia University Hospitals, Inc. v. Casey*, 885 F.2d 11, 22 (3rd Cir. 1989). These requirements include establishing rates that take into account the situation of hospitals serving a disproportionate number of low-income patients. *Id.* States are also required to find that the rates are reasonable and adequate to meet the necessary costs of an efficiently operated hospital while assuring Medicaid patients reasonable access to inpatient hospital care. *Id.*, citing 42 U.S.C.A. § 1396a (West.Supp. 1989).[1] States must comply with these requirements to be eligible for federal funds.

¶ 4 Under Pennsylvania's Medicaid program, known as the Medical Assistance Program or "MAP," the DPW makes payments directly to providers of medical services on a "fee for service" basis. Until 1984, MAP through DPW reimbursed hospitals based on their actual costs. In the face of spiraling health care costs, however, in 1984, DPW adopted a prospective payment system. "Under that system, the operating costs of most acute care inpatient hospital stays are reimbursed by a flat payment per discharge that is a multiple of the hospital's 'payment rate' and a 'relative value' assigned to the diagnostic related group ('DRG') into which the particular case falls." *Temple University v. White*, 941 F.2d 201, 208 (3rd Cir. 1990).[2] Stated differently, in most cases, the patient's diagnosis determined what DPW

* Retired Justice assigned to Superior Court.

1. These requirements are part of the so-called "Boren Amendment," enacted in 1980.

2. In 1988, Hospital sued the state in federal court, claiming that the state's 1988–1989 rate of payment for the expenses associated with treating Medicaid recipients did not comply with the federal requirements set forth *supra*. The district court found in favor of Hospital and applied its finding to other Pennsylvania hospitals that had instituted similar lawsuits. *Temple University v. White*, 941 F.2d 201, 205–206 (3rd Cir. 1990). The Third Circuit Court of Appeals upheld the district court. *Id.* at 211.

would pay, rather than the length of the patient's stay in the hospital or the intensity of the care received there. (Trial court opinion, 4/23/99 at 2, finding of fact 9.) Certain hospitals, such as Hospital in this case, were, however, still entitled to additional payments because they served a disproportionate share of indigent patients. Hospital also received additional payments to defray capital costs and in recognition of its status as a teaching hospital, for which the cost of providing medical care is higher than at a community hospital. (Testimony of Robert H. Lux, 3/15/99 at 55–56, R.R. at 1394a 1395a.) [3]

¶ 5 In the mid–1980's, pursuant to § 1915(b) of the Social Security Act, 42 U.S.C. § 1396(n)(b), Pennsylvania obtained a waiver from some of the federal Medicaid program requirements. Section 1915(b), as interpreted at that time by the federal agency responsible for approving waivers, allowed states flexibility, subject to certain limitations, in developing innovative, cost-effective, and efficient programs for providing care to indigent populations while maintaining access to and quality of care for those populations. Rand E. Rosenblatt, *The Legal Implications of Health Care Cost Containment: A Symposium: Medicaid Primary Case Management, the Doctor–Patient Relationship, and the Politics of Privatization,* 36 Case W.Res.L.Rev. 915, 949–950 (1986), citing 46 Fed.Reg. 48,524 (1981) and 48 Fed.Reg. 23,212 (1983). *See also* 42 C.F.R. § 430.25(b).

· ¶ 6 Pursuant to the waiver provision, DPW instituted an experimental program known as "HealthPASS" [4] under which Medicaid recipients in certain sections of southern and western Philadelphia were required to enroll in a Medicaid managed care company. The managed care company, appellee Healthcare Management Al-

ternatives, Inc. ("HMA"), contracted with DPW to provide *inter alia,* in-patient hospital services to persons in the targeted region who were eligible for Medicaid. HMA did not, however, provide medical services directly; rather, it entered into contracts with various health care providers, including Hospital, to provide such services. These contracts were subject to DPW approval. (R.R. at 23a–97a.)

¶ 7 The contract between HMA and DPW described HMA as a "health insuring organization" ("HIO"), defined as "an entity which assumes an underwriting risk to pay for medical services provided to recipients in exchange for a premium or subscription charge paid by the state agency." (*Id.* at 26a, 29a.) DPW therefore agreed to pay HMA a "capitation payment," defined as a monthly payment for each recipient enrolled under the contract at the rates specified by the contract. (*Id.* at 28a.) While recognizing that DPW was responsible for prudently spending state and federal funds, the contract also recognized that HMA was a for-profit corporation. (*Id.* at 83a.) As a result, the contract provided a system of either refunds or credits under certain specific circumstances. (*Id.*) As HMA's chief witness testified, however, "HMA made money by spending less than it received from DPW. The focus of the HIO was basically to try to control or limit some hospitalizations and pass that money onto the other providers." (Testimony of Richard Braksator, 3/16/99 at 6, R .R. at 1632a.) [5]

¶ 8 Pursuant to HMA's contract with DPW, HMA entered into a contract with Hospital in 1991 to provide services to HealthPASS participants. According to Mr. Braksator, the terms of such contracts were set by negotiation. (*Id.*) In the April 1, 1991 contract, Hospital agreed, *inter*

---

**3.** Mr. Lux was the chief financial officer for Hospital during the relevant time period.

**4.** "PASS" is an acronym for Philadelphia Accessible Services System. (R.R. at 26a.)

**5.** Richard Braksator was the vice-president for administration of HMA between 1989 and 1993, and was HMA's senior vice-president for administration and chief financial officer from November 1993 through June 1995.

*alia,* to provide inpatient hospital services to Medicaid recipients in the HealthPASS region in consideration for which HMA would pay Hospital at a rate of 114% of the relevant DRG rate. (R.R. at 99a.) By its terms, the contract remained in effect until June 30, 1993. (*Id.*) During the contract period, Hospital would hand-write the applicable amount due under the contract for inpatient hospital care in the "Remarks" section of forms UB–82 and UB–92, the forms Hospital used to bill HMA. Hospital provided this service for the benefit of HMA, which lacked the computer software necessary to calculate the amount. (Testimony of Richard Braksator, 3/16/99 at 13, R.R. at 1639a.)

¶ 9 By letter dated April 20, 1993, Hospital informed HMA of its intent to renegotiate its existing arrangement with HMA. As the trial court found, "[Hospital] advised HMA by letter that it wished to renegotiate its payment arrangement with HMA and did not wish to extend the current contract. [Hospital] had concluded that HMA's payments were no longer adequate." (Trial court opinion, 4/23/99 at 3, finding of fact 13, citing Hospital's exhibit 4 and Lux testimony at 90–94.) Nevertheless, after the contract expired in June of 1993 and through the period in controversy, until 1997, Hospital continued to hand-post the adjusted DRG rate on the UB–82's and UB–92's it submitted to HMA for payment.

¶ 10 During the period in dispute, however, specifically in March and April of 1994, the parties exchanged several letters. In the first letter, dated March 15, 1994, HMA indicated that it had previously extended the prior rate arrangements in anticipation of receiving Hospital's proposal

to renew its participation with HMA. (R.R. at 102a.) HMA concluded by indicating that it "will reimburse [Hospital] at the out of area rate paid to all non-contracted facilities." [6] (*Id.*)

¶ 11 Hospital responded by letter dated March 24, 1994, in which Herbert White, the Hospital agent to whom HMA's March 15th letter had been directed, indicated dismay with HMA's March 15th letter for two reasons: first, because Hospital had previously made it clear that it intended to bill and collect its published charges from all non-contracted third-party payers such as HMA; and second, because Hospital had never agreed to extend the previous agreement. (R.R. at 103a.) HMA answered by letter dated April 8, 1994, in which it acknowledged that Hospital considered the expired rate agreement no longer valid. (*Id.* at 104a.) The April 8, 1994 letter also indicated that because Hospital was negotiating in good faith, HMA was willing to leave the expired rate in effect until negotiations were complete; otherwise, it would reimburse Hospital at the rate of $705 per diem. (*Id.* at 104a.) Hospital replied by letter dated April 26, 1994, flatly rejecting the out-of-area rate and reiterating its position that "[t]o the extent that a future agreement results in a contractual gap in our relationship, [Hospital] will expect payment at full charges for any services provided during that gap." (*Id.* at 106a.) (*See also* trial court opinion, 4/23/99 at 4–5, findings of fact 17–20.) [7]

¶ 12 During the period from January 1, 1994 to January 31, 1997, Hospital submitted hundreds of claims to HMA for payment.[8] Each claim itemized Hospital's published charges for each service provided, and also included the hand-posted

---

6. This rate amounted to $705 per diem, well below Hospital's medical assistance cost-per-day of $1,204. (Testimony of Richard Braksator, 3/16/99 at 38, R.R. at 1664a.)

7. The parties apparently negotiated a new contract in January 1997, when the HealthPASS program ended. (Braksator testimony, 3/16/99 at 25, R.R. at 1651a.) Mr. Braksator

did not know whether the subject of retroactivity arose during contract negotiations because he was not a party to those negotiations. (*Id.* at 26, R.R. at 1652a.)

8. Hospital's complaint sets the number at more than 250; however, the record contains approximately 450 claims.

DRG code and corresponding adjusted DRG rate in the "Remarks" section. (*See* R.R., vol. 2 at 478a–928a.) HMA paid the amount written in the "Remarks" section for most of these claims, but only paid the $705 per diem rate set for out-of-area non-contracting providers for others. (Braksator testimony, 3/16/99 at 42, R.R. at 1668a.) In December 1997, when HMA refused to reimburse Hospital for the difference between what HMA had paid and Hospital's published charges for these claims, Hospital brought suit, alleging that "the surrounding circumstances, the ordinary course of dealing and the common understanding within the hospital and health care industry created an implied contract between HMA and [Hospital] for the payment of [Hospital's] reasonable charges as set forth in [Hospital's] bills...." (Hospital's complaint at 3, R.R. at 14a .) [9]

¶ 13 Following a non-jury trial, the trial court found an implied contract in favor of HMA, stating that Hospital evidenced its intent to accept HMA's offer to continue the terms of the 1991 contract when it wrote the DRG amounts in the "Remarks" portion of the UB–82's and UB–92's. (Trial court opinion, 4/23/99 at 6–7.) The trial court further concluded that Hospital, by asking for full payment for services rendered, "is asking this court to circumvent the base DRG Medicaid rates set by DPW and mandated by federal law. As the law does not violate the constitution, this court cannot and will not presume to act as a legislature." (*Id.* at 7.)

¶ 14 In response, Hospital filed a posttrial motion, requesting judgment notwithstanding certain of the trial court's findings and conclusions, or such other or further relief as the court deemed appropriate. (R.R. at 1751a–1757a.) The trial court denied the motion and this timely appeal followed. On appeal, Hospital raises the following issues:

9. The trial court found that Hospital established its published rates, which were equivalent to or lower than the rates of other Philadelphia hospitals, after considering what

1. Whether, despite written notice from plaintiff Temple University Hospital, Inc. ('Temple') to defendant Healthcare Management Alternatives, Inc. ('HMA') that an expired rate agreement was no longer in effect, Temple and HMA nevertheless, by conduct inconsistent with that expired rate agreement, manifested a mutual assent to renew it.

2. Is the rate of payment to a hospital by a managed care organization insuring Medicaid eligible persons, in the absence of an agreement between them, limited by the base Medicaid DRG rate established by the state for its payments to hospitals?

Appellant's brief at 3.

■ ¶ 15 "In reviewing a non-jury verdict, the appellate court must determine 'whether the findings of the trial court are supported by the evidence or whether the trial court committed error in any application of the law.' " *Refuse Mgmt. Systems, Inc. v. Consolidated Recycling & Transfer Systems Inc.*, 448 Pa.Super. 402, 671 A.2d 1140, 1145 (1996), quoting *Coscia v. Hendrie*, 427 Pa.Super. 585, 629 A.2d 1024, 1026 (1993). "An appellate court has the authority to determine whether the findings of the trial court support its legal conclusions, and may interfere with those conclusions if they are unreasonable in light of the trial court's factual findings." *Refuse Management Systems*, 671 A.2d at 1145 (citation omitted). Furthermore, "judgment notwithstanding the verdict may be granted 'only in a clear case, where after viewing the evidence in the light most favorable to the verdict winner, no two reasonable minds would disagree that the verdict was improper.' " *Id.*, quoting *McDole v. Bell Telephone Co. of PA.*, 441 Pa.Super. 88,

other hospitals were charging for similar services. (Trial court opinion, 4/23/99 at 5, finding of fact 22.)

656 A.2d 933, 935 (1995) (other citations omitted).

¶ 16 The parties agree that the written 1991 contract had expired by its terms on June 30, 1993. (*See* Lux testimony, 3/15/99 at 113, R.R. at 1452a; Braksator testimony, 3/16/99 at 18, R.R. at 1644a.) Furthermore, neither party avers the existence of an oral contract. As a result, during the relevant time period, if a contract existed at all, its existence was premised on the parties' conduct.

¶ 17 In this case, it is undisputed that HMA offered in writing to extend the terms of the 1991 contract until the parties reached an agreement as to the terms of a new contract. It is also undisputed that the parties continued to engage in a course of conduct similar to that established by their prior agreement: Hospital provided medical services to HealthPASS participants and submitted forms UB–82 and UB–92 reflecting both its published charges and the adjusted DRG rate. HMA then paid for Hospital's services, most frequently basing its payments on the hand-written adjusted DRG rate, which was calculated using the base DRG rate for Hospital prior to July 1, 1993,[10] but sometimes paying the $705 per diem rate. This course of conduct continued from June 30, 1993 through January 31, 1997. The narrow question, therefore, is whether Hospital's conduct manifested an intention to accept HMA's offer when it hand-wrote the adjusted DRG rates onto the UB–82's and UB–92's and then collected HMA's payments, as the trial court found.

¶ 18 The question whether an undisputed set of facts establishes a contract is a matter of law. *Refuse Management Systems,* 671 A.2d at 1146. Because contract interpretation is a question of law, this court is not bound by the trial court's interpretation. *Banks Engineering Co., Inc. v. Polons,* 697 A.2d 1020, 1022 (Pa.Super.1997) (citations omitted), *remanded on other grounds,* 561 Pa. 638, 752 A.2d 883 (2000). " '[A]n offer may be accepted by conduct and what the parties d[o] pursuant to th[e] offer is germane to show whether the offer is accepted.' " *O'Brien v. Nationwide Mut. Ins. Co.,* 455 Pa.Super. 568, 689 A.2d 254, 259 (1997), quoting *Accu-Weather, Inc. v. Thomas Broadcasting Co.,* 425 Pa.Super. 335, 625 A.2d 75, 78 (1993) (other citations omitted). Furthermore, " '[i]t is a basic principle of the law of contracts that an acceptance must be unconditional and absolute.' " *O'Brien,* 689 A.2d at 258, quoting *Thomas A. Armbruster, Inc. v. Barron,* 341 Pa.Super. 409, 491 A.2d 882, 887 (1985). "Whether particular conduct expresses an offer and acceptance must be determined on the basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances." John Edward Murray, Jr., Murray on Contracts § 37, at 82 (3rd ed.1990).

¶ 19 In this case, we cannot agree with the trial court that the parties' conduct expressed Hospital's unconditional and absolute acceptance of HMA's offer for the simple reason that Hospital, in writing, expressly rejected HMA's offer twice, by letters dated March 24, 1994 and April 26, 1994. In the same letters, Hospital also "offered" to bill and collect its published charges from HMA. "[A] reply [to an offer] which ... changes the terms of the offer, is not an acceptance, but, rather, is a counter-offer, which has the effect of terminating the original offer." *Yarnall v. Almy,* 703 A.2d 535, 539 (Pa.Super.1997).

¶ 20 Nor can we accept the trial court's legal conclusion that Hospital could assent by conduct to an offer it had already expressly rejected in writing. As indicated in the Restatement (Second) of

10. According to Hospital, if the parties had been operating under the terms of the 1991 contract, HMA should have been basing its payments on the lower DRG rates that became effective July 1, 1993. (Hospital's brief at 17.)

Contracts § 53 (1981), except under certain circumstances not relevant here, "the rendering of a performance does not constitute an acceptance if within a reasonable time the offeree exercises reasonable diligence to notify° the offeror of non-acceptance." *Id.* at § 53(2). We reject HMA's argument that § 53 must be construed to mean that rejection of the offer must occur at a reasonable time *after performance.* (HMA's brief at 10–11.) HMA cites no cases to support its interpretation of § 53 and we have found none. Furthermore, we read § 53 to require the offeree to notify the offeror of non-acceptance within a reasonable time of *receiving the offer.*

¶ 21 We also find this case distinguishable from *Refuse Management Systems, supra,* and *Accu–Weather,* supra, two of the cases on which the trial court relied, because in neither of those cases did one of the parties expressly reject the terms of the implied contract. In *Refuse Management Systems,* undisputed evidence established that LCA, the lessor of a trash transfer station, intended to use the services of RMS, a waste brokerage company, "to haul waste from the station on a continuing basis *at an agreed price,* and to pay for those services each week." *Refuse Management Systems,* 671 A.2d at 1147 (emphasis added). The dispute in that case centered on lessor's obligations after it leased the station to a third party lessee. Lessee kept on its payroll the employee used by lessor as its contact with RMS, and lessor advised RMS to continue to contact that employee after lessor leased the station to lessee. *Id.* at 1147–1148.

¶ 22 In *Accu-Weather, supra,* the parties conducted business pursuant to an unexecuted agreement that "declare[d] on its face an intention that the Agreement would 'be operative before execution' with the acceptance of/access to a benefit (service) offered and provided by [Accu-weather] to [Thomas], which 'course of dealing' would be considered the equivalent of embracing the binding effect of the document as if executed." *Accu-Weather,* 625 A.2d

at 79. As this court observed, "[Thomas] had a duty to speak when confronted with a document providing, unequivocally, that receipt of [Accu-weather's] services would be tantamount to assenting to the binding nature of the … Agreement." *Id.* In this case, unlike *Accu-Weather,* HMA's offer did not indicate unequivocally that performance would be tantamount to assent, and, even more importantly, Hospital spoke, clearly and unambiguously rejecting HMA's offer on two occasions.

¶ 23 Furthermore, our review of the entire transcript of the two-day trial discloses nothing indicating that any of Hospital's employees believed the 1991 contract was still in effect or acted pursuant to a belief that it had been extended. Rather, Hospital employees indicated they continued to write the adjusted DRG amount on the forms as HMA had previously requested, while the parties were negotiating a new contract. (*See* trial court opinion, 4/23/99 at 4, finding of fact 16.) We do not agree that Hospital manifested its assent to extending the 1991 contract merely because it agreed to collect something for the services it was compelled by law to render while the parties negotiated a new contract. (*Id.* at 7, finding of fact 35.) Furthermore, as Hospital indicates and as the trial court found, even HMA did not consistently comply with the terms of the 1991 contract, occasionally paying the $705 per diem instead of the adjusted DRG rate. (*Id.* at 5, finding of fact 21.)

■ ¶ 24 This brings us to Hospital's second issue, in which Hospital asks whether the base Medicaid DRG rate established by the state limits the rate of payment a managed care organization (such as HMA) may make to a hospital treating Medicaid-eligible persons. Both parties concede that the trial court was not required to decide this issue, having found an implied contract by conduct. (Hospital's brief at 20; HMA's brief at 16.) In fact, HMA states in its brief that "the interpretation of the Medicaid regulation

was not dispositive of the decision. Therefore that interpretation is not properly before this court." (*Id.*)

¶ 25 We agree. We find, however, that the trial court's conclusions of law 32 through 35 are erroneous because they do not take into account the fact that DPW instituted the HealthPASS program pursuant to a § 1915(b) waiver; therefore the trial court was required to consider the implications of the waiver agreement. Furthermore, the court appears to have misinterpreted the scope of base DRG rates by concluding that those rates included all of the payments to which Hospital was entitled under the law. Our reading of both the federal and state regulations the parties have cited does not support the trial court's conclusions. *See, e.g.,* 55 Pa.Code § 1163.51(a), (b), and (d).[11]

¶ 26 While *amici,* in their brief, cite to various provisions they claim *are* applicable to programs such as HealthPASS, these sections were not argued before the trial court. (*See, e.g.,* brief of *amicus curiae* at 13 14.) *Amici* also cite to the Commonwealth's Application to the Department of Health & Human Services for waivers under § 1915 of the Social Security Act so that Pennsylvania could initiate the HealthPASS program. (Brief for *amicus curiae* at 15–16.) This application is not, however, part of the record certified to this court and was likewise not presented to the trial court.

¶ 27 As a result, while we find that the trial court's conclusions of law 32 through 35 are erroneous, we do not decide what, if any, those conclusions should have been. Rather, we merely find that the parties' conduct did not create an implied contract during the years in question.[12] As a result, we reverse the order of the trial court entering judgment in favor of HMA and remand for additional proceedings consistent with this Opinion.

¶ 28 Reversed and remanded. Jurisdiction relinquished.

---

11. Mr. Lux testified that DPW's payments for disproportionate share, medical education and capital expenses represented between 25 and 35 percent of Hospital's medical assistance revenues during the 1993–1994 time period. (Notes of testimony, 3/15/99 at 81, R.R. at 1420a.) Mr. Lux also testified that Hospital received those additional payments for non-HealthPASS, Medicaid-eligible patients during the relevant time period, but did not receive those payments for HealthPASS patients. (*Id.* at 70–75, R.R. at 1409a–1414a.)

12. Clearly, the parties' conduct did not create an implied contract under which HMA paid Hospital's published rates, as Hospital does not allege that HMA ever paid those rates.