## Temple University v. Americhoice of Pennsylvania Inc.

*Matthew Strickler,* for plaintiffs.
*Manuel Delvalle,* for defendant.

HERRON, *J.,* September 17, 2001—This matter arises from a dispute between health care provider(s) of emergency hospital and physician services and a health maintenance organization where the parties no longer have an effective contract, but patients of the health maintenance organization continue to seek treatment from the hospital(s). The hospitals continue to treat these patients for emergency services both before and after the patients are "stabilized" and the hospitals seek payment for these services but the parties cannot agree on whether to pay the hospitals or what the rate of payment should be.

Presently before this court is the motion of plaintiffs, Temple University—Of the Commonwealth System of Higher Education et al., for partial summary judgment on Count I of their complaint, seeking declaratory judgment in their favor. Defendant, Americhoice of Pennsylvania Inc., opposes this motion.

For the reasons set forth, the court is denying plaintiffs' motion for partial summary judgment on Count I.

## BACKGROUND

Temple provides emergency hospital and physician care at six locations in Philadelphia and Bucks counties.

Compl. and answer ¶¶1-11. Americhoice is a health maintenance organization which has contracted with the Pennsylvania Department of Welfare (DPW) to pay for medical care for persons eligible for the Medical Assistance Program (Medicaid) known as HealthChoices. Compl. and answer ¶¶12-14. DPW pays Americhoice a capitation fee based on the number of Medicaid beneficiaries enrolled with Americhoice, and Americhoice pays for the medical care, including emergency inpatient and outpatient medical care, of its enrollees. Compl. and answer ¶14.

Prior to August 1, 2000, Temple had a contract with Americhoice under which Temple and Americhoice agreed on a discounted rate of payment from Americhoice to Temple for medical care provided to persons insured by Americhoice. Compl. and answer ¶15. The contract expired on August 1, 2000 and the parties have been unable to successfully negotiate the terms of a successor agreement. *Id.* Notwithstanding the expiration of that contract, Americhoice members continue to come to Temple hospital facilities seeking emergency medical care. Compl. and answer ¶16. Temple hospitals have been admitting approximately 60 Americhoice members per month. *Id.;* Compl., exhibit F.

Temple and Americhoice agree that, under the federal Emergency Treatment and Active Labor Act[1] Temple hospital facilities have the same legal obligations to Americhoice members as they have to others who come to

---

1. EMTALA was enacted as part of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985, 100 Stat. 164, and as amended, 42 U.S.C. §1395dd.

their emergency rooms with an apparent medical emergency, prior to stabilization. Compl., exhibit A; pls. brief in support of their motion at 3; def. supplemental mem. in opposition to the pls. motion at 2-3.[2] The parties, however, cannot agree on whether Americhoice has a financial obligation to Temple for services rendered to Americhoice members after they are "stabilized" or what rate of payment, if any, would be owed to Temple by Americhoice for services provided to patients after stabilization.

With this background, plaintiffs filed their complaint, stating counts for declaratory judgment and breach of an implied contract. Defendant filed its answer. Soon, thereafter, plaintiffs filed their motion for partial summary judgment as to Count I, seeking a declaration that:

"(1) Temple may not transfer an Americhoice member, who seeks emergency medical treatment at a hospital in the Temple University Health System, without the informed consent of the Americhoice member or member of that member's family, regardless of whether the transfer occurs before or after the patient has been "stabilized" within the meaning of EMTALA;

"(2) Americhoice, who seeks to transfer its member from Temple to another hospital, has the responsibility for obtaining the informed consent of the Americhoice member or member of that member's family; and

"(3) Where an Americhoice member seeks emergency medical treatment at a hospital in the Temple University

---

2. Plaintiffs, however, are not seeking relief under EMTALA. See 7/24/01 N.T. 7.

Health System, Americhoice must pay Temple for medically necessary services provided to that member, regardless of whether Americhoice has a contract with Temple governing the rate of payment and regardless of whether services are provided before or after the patient has been 'stabilized' within the meaning of EMTALA." See pls. proposed order.

Defendant opposes this motion, asserting that genuine issues of fact exist regarding the rate of payment and whether the purportedly emergent care was warranted.

## DISCUSSION

Rule 1035.2 of the Pennsylvania Rules of Civil Procedure allows a court to enter summary judgment "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action." A court must grant a motion for summary judgment when a non-moving party fails to "adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor." *Ertel v. Patriot-News Co.,* 544 Pa. 93, 101-102, 674 A.2d 1038, 1042 (1996) *cert. denied,* 519 U.S. 1008, 117 S.Ct. 512, 136 L.Ed.2d 401 (1996). A motion for summary judgment must be viewed in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Pennsylvania State University v. County of Centre,* 532 Pa. 142, 145, 615 A.2d 303, 304 (1992). Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law will summary judg-

ment be entered. *Skipworth v. Lead Industries Ass'n Inc.,* 547 Pa. 224, 230, 690 A.2d 169, 171 (1997).

The issues of the present motion include: (1) whether Temple is obligated to transfer Americhoice members to an in-network hospital after the member's emergency medical condition has "stabilized;" (2) whether Temple may not transfer the Americhoice member to another hospital, at the direction of Americhoice, without the informed consent of the Americhoice member or member of that member's family; (3) whether Americhoice or Temple is responsible for obtaining the informed consent; and (4) whether Americhoice is obligated to pay Temple for medically necessary services provided to the Americhoice member who seeks medical treatment at a hospital in the Temple University Health System, regardless of whether there is a contract governing the rate of payment or whether services were provided before or after the patient has been stabilized.[3]

---

3. Here, notwithstanding defendant's assertions, this court is not being asked to resolve what is the appropriate rate of payment or the reasonableness of Temple's charges or the medical necessity of care rendered by Temple, since those issues are encompassed by Count II of the complaint and are not subject to the present motion. Rather, summary judgment may be appropriate to resolve the count for declaratory judgment which focuses on defining the legal rights and obligations between the parties.

The Declaratory Judgment Act gives the court "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." 42 Pa.C.S. §7532. The Act is remedial and is to be liberally construed and affords "relief from uncertainty and insecurity with respect to rights, status and other legal relations." 42 Pa.C.S. §7541. See also, *Juban v. Schermer,* 751 A.2d 1190, 1193 (Pa. Super. 2000).

This court found no Pennsylvania or out-of-state case, nor did either party cite one, which has ever decided these precise issues. However, there are certain areas of law which provide guidance.

## I. *The Parties' Obligations Under EMTALA*

First, the present action does not arise under EMTALA, but this statute is cited by both parties in regard to the hospitals' duties with respect to rendering emergency care. Certain provisions of EMTALA are relevant for ruling on the present motion.

This federal statute places obligations of screening and stabilization upon hospitals and emergency rooms that receive patients suffering from an "emergency medical condition." *Roberts v. Galen of Virginia Inc.*, 525 U.S. 249, 250 (1999) (holding that plaintiff need not show an improper motive in order to state a violation under EMTALA for failure to "appropriately" stabilize a patient). The purpose of EMTALA is to prevent hospitals

Ironically, the parties had previously litigated the matter of the correct rate of payment in *Temple University Hospital Inc. v. Healthcare Management Alternatives Inc.*, 764 A.2d 587 (Pa. Super. 2000). In that case, the Superior Court reversed the trial court's finding of an implied contract in favor of the managed care company and the denial of the hospital's motion for judgment n.o.v. 764 A.2d at 595. The Superior Court reasoned that Temple had explicitly manifested its intention not to accept HMA [Americhoice's predecessor]'s offer of the base Medicaid DRG rates for treatment to eligible persons. *Id.* at 594. It further reasoned that HMA did not consistently comply with the terms of the 1991 contract by occasionally paying the $705 per diem rate instead of the adjusted DRG rate. *Id.* That case could be relevant for deciding Count II in the present case, but it is not dispositive of the present motion before this court.

from refusing to provide emergency medical treatment or transferring patients before their emergency conditions are stabilized. *Slabik v. Sorrentino,* 891 F. Supp. 235, 236 (E.D. Pa. 1995). Congress passed EMTALA "amid growing concerns of inadequate emergency room care for poor and uninsured patients." H.R. no. 241, 99th Cong.,1st Sess., Part 3 at 5, U.S. Code Cong. and Admin. News, pp. 42, 726, quoted in *Slabik* 891 F. Supp. at 237. The growing concern was that hospitals were "dumping" patients unable to pay for emergency treatment. *Doe v. Montgomery Hospital,* 1996 WL 745524 at *7 (E.D. Pa. December 23, 1996). The Act "was designed to create a new cause of action for failure to screen and stabilize patients, not to federalize traditional state-based claims of negligence or malpractice." *Id.*

To make out a violation of EMTALA, a plaintiff must demonstrate the following: "(1) the patient had an emergency medical condition; (2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred; (4) prior to transfer of an unstable patient, the transferring hospital did not obtain the proper consent or follow the appropriate certification and transfer procedures." *Id.* at *8. (citations omitted)

Under EMTALA, if a patient presents with an emergency condition, the hospital either must treat and stabilize the patient if the hospital's staff and facilities are available for such treatment or the hospital must transfer the individual. 42 U.S.C. §1395dd(b)(1). Transfer is allowed only if the receiving facility has the available space and qualified personnel for treatment of the individual and the facility has agreed to accept the transfer and pro-

vide appropriate medical treatment. 42 U.S.C. §1395dd(c)(2). To transfer an unstabilized patient, the hospital is required to obtain the informed consent of the patient or member of the patient's family. 42 U.S.C. §1395(b)(2), (3).

Further, the hospital is deemed to meet EMTALA's requirements "with respect to an individual if the hospital offers the individual further medical examination and treatment and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or person acting on the individual's behalf) refuses to consent to the examination and treatment." 42 U.S.C. §1395dd(b)(1)(B)(2). The burden rests on the hospital to "take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment." *Id.* Similarly, the hospital is deemed to meet the requirements "if the hospital offers to transfer the individual to another medical facility. . . and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or person acting on the individual's behalf) refuses to consent to the transfer." 42 U.S.C. §1395dd(b)(1)(B)(3). "The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer." *Id.*

In addition, an "emergency medical condition" is defined as "a medical condition which manifests itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical atten-

tion could reasonably be expected to result in the following:

"(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

"(ii) serious impairment to bodily functions, or

"(iii) serious dysfunction of any bodily organ or part. . . ." 42 U.S.C. §1395dd(e)(1)(A).

Stabilization under the Act requires such medical treatment of the emergency medical condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta). 42 U.S.C. §1395dd(e)(3)(A).

Clearly, it is the hospital's obligation, and not that of the HMO or health care insurer, to obtain the patient's informed consent to treat or transfer or refuse such treatment or transfer prior to stabilization. However, EMTALA's provisions do not state what the hospital must do after the patient is stabilized. Indeed, EMTALA is silent about what to do once a patient is stabilized in regard to transferring that patient or in regard to obtaining consent. Therefore, this statute does not provide any authority for this court to grant the declaratory relief sought by the plaintiffs.

## II. *Parties' Obligations Under Quality Health Care Accountability and Protection Act*

Defendant argues that the parties' obligations are governed by Act 68, which is known as the Quality Health Care Accountability and Protection Act, codified at 40 P.S. §991.2101 et seq. Specifically, section 2116 of the Act requires that when an enrollee (of a managed care plan) seeks emergency services and the health care provider determines that such services are necessary, the health care provider shall initiate necessary intervention to evaluate and, if necessary, stabilize the condition of the enrollee without seeking or receiving authorization from the managed care plan. 40 P.S. §2116. The managed care plan must pay all reasonably necessary costs associated with the emergency services provided during the emergency, and must consider both the presenting symptoms and the services provided when processing claims. *Id.* The emergency health care provider must notify the enrollee's managed care plan of its provision of emergency services and the condition of the enrollee. *Id.* "If the enrollee's condition has stabilized and the enrollee can be transported without suffering detrimental consequences or aggravating the enrollee's condition, the enrollee *may* be relocated to another facility to receive continued care and treatment as necessary." *Id.* (emphasis added) The Act also provides for the continuity of care by a health care provider at the enrollee's option for a transitional period of up to 60 days from the date the enrollee was notified by the plan of the termination or pending termination of its contract with a participating health care provider. 40 P.S. §221.2117.

This Act does not say the hospital or health care provider must transfer the patient once stabilized. The Act also does not refer to informed consent of the patient and who must obtain it. Rather, the clear wording of the Act is permissive as to transferring a patient after stabilization. This Act, like EMTALA, does not provide any authority for this court to grant the declaratory relief sought by the plaintiffs.

## III. *Parties' Obligations Under Common Law*

Plaintiffs argue that the default rule would be to rely on Pennsylvania's malpractice law for what to do once the patient is stabilized. See *Bryan v. Rectors and Visitors of Univ. of Virginia.* 95 F.3d 349, 351 (4th Cir. 1996). Assuming, arguendo, that the court may rely on Pennsylvania common law, it is still not clear what hospitals are required to do with respect to the transfer of stabilized patients. Nor is it clear that this court has authority to say what the rule should be.

Plaintiffs rely on *Riddle Memorial Hospital v. Dohan,* 504 Pa. 571, 475 A.2d 1314 (1984) for the proposition that hospitals are obligated to act reasonably and not to act in a manner which would increase the risk of harm to their patients by transferring them even if "stabilized." In that case, the hospital had transferred a patient to another hospital at the direction of his personal physician, after confirming that the man had had a heart attack. During the transfer, the man died. The Supreme Court affirmed the finding of the trial court that Riddle Memorial was legally responsible for the man's death.

Plaintiffs also rely on out-of-state cases for the proposition that it is unreasonable for a hospital to transfer a patient because of concern for whether the hospital will be paid and such transfer may subject the hospital to liability for damages suffered by the patient as a result of the transfer. See *Brownsville Medical Center v. Gracia,* 704 S.W.2d 68, 77 (Tex. Ct. App. 1985) (holding that evidence supported finding of negligence on part of doctor and hospital who transferred patient, in part, because of concern of patient's ability to pay); *Thompson v. Sun City Community Hosp. Inc,* 141 Ariz. 597, 604, 688 P.2d 605, 612 (1984) (holding that hospital breached its duty, as a matter of law, where it transferred patient for financial reasons while emergency care was medically indicated); *Corten v. Harbor Hospital Inc.,* 279 A.D. 673,108 N.Y.S.2d 352, 353 (1951) (evidence showed that patient was removed following surgery, against wishes of doctor and patient, for administrative purposes in breach of hospital's duty). These cases do not persuade this court that plaintiffs are entitled to the declaratory relief which they seek.

The Pennsylvania Supreme Court holds firmly that a *physician* must obtain informed consent from a patient before performing a surgical or operative procedure. *Morgan v. MacPhail,* 550 Pa. 202, 205, 704 A.2d 617, 619 (1997). However, informed consent has not been required in cases involving nonsurgical procedures.

Though a hospital may be liable if it transfers a patient and that patient is injured following the transfer, there seems to be no authority for the proposition that informed consent must be obtained from the patient once

the patient is stabilized. Further, there seems to be no authority that the HMO or health care insurer should be charged with the responsibility of obtaining the informed consent, even though it is the one insisting upon the transfer of a "stabilized" patient.

The issue of whether patients, whom plaintiffs allegedly refuse to transfer to defendant's in-network hospitals, were or were not "stabilized" presents a genuine issue of material fact and cannot be disposed of by the present motion. Moreover, this issue is encompassed by Count II of the complaint (assumpsit—implied contract) and should be addressed under that claim. Moreover, the issue of whether defendant is obligated to pay plaintiffs for medically necessary services rendered to patients whether or not they were stabilized depends, in part, on the determination of whether the patient was stabilized. This issue, as well, cannot be disposed of by the present motion.

## CONCLUSION

Having found no authority for granting the declaratory relief sought by the plaintiffs, the court cannot now grant plaintiffs' motion for partial summary judgment on Count I of the complaint. For this reason, the court is issuing a contemporaneous order, denying the motion.

## ORDER

And now, September 17, 2001, upon consideration of plaintiffs' motion for partial summary judgment as to Count I (declaratory judgment) of the complaint, defendant's response in opposition thereto, having heard

oral argument on the matter, all other matters of record, and in accord with the opinion being filed contemporaneously with this order, it is hereby ordered that plaintiffs' motion for partial summary judgment on Count I of the complaint is denied.