**Richard ZAPPILE and Stephanie Zappile, h/w, Appellees**

v.

**AMEX ASSURANCE COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 30, 2007.

Filed June 8, 2007.

Reargument Denied Aug. 14, 2007.

Kristin H. Jones, Philadelphia, fro appellant.

Richard T. Brown, Jr., Philadelphia, for appellees.

BEFORE: JOYCE, KLEIN, JJ. and McEWEN, P.J.E.

OPINION BY KLEIN, J.:

¶ 1 AMEX Assurance Company (AMEX) appeals from the judgment entered against it following a non-jury trial on a bad faith claim made by plaintiffs, Richard and Stephanie Zappile. The trial court awarded $75,000 to the Zappiles. After a thorough review of the official record, the submissions by the parties and relevant law, we reverse.

¶ 2 The bad faith claim arises from the "dance" plaintiffs and defendants go through in attempting to settle a dispute. Here, Richard Zappile, ex-Deputy Police Commissioner for the Philadelphia Police Department, ex-Deputy Mayor under now Governor Rendell and current Chief of Police for the Philadelphia Housing Authority, was struck by an automobile while walking his dog. Zappile suffered left knee and shoulder injuries as well as other assorted bumps and bruises. Ultimately, he was diagnosed with a torn rotator cuff and underwent arthroscopic surgery, which was successful. Zappile settled his claim against the tortfeasor for the limits of her $15,000 automobile insurance policy. Zappile made a claim against his own automobile insurance policy, issued by defendant, AMEX, for first party benefits, which were paid to the limits of coverage, including $1,000 for lost wages. After the third party claim settled, Zappile made a

claim for underinsured motorist (UIM) benefits from AMEX. Zappile had a total stacked coverage of $150,000, for three insured vehicles each with $50,000 in UIM coverage.

¶ 3 Zappile, through his attorney, demanded the policy limits. AMEX believed the value of the damages was far less and offered slightly more than $32,000. The negotiation process, such as it was, was not successful and the case went to arbitration in September, 2004, slightly less than three years after the accident and slightly more than two years after the third party claim settled and the UIM claim was first made. AMEX never officially offered more than the original $32,000 and Zappile never officially requested less than the policy limits. Ultimately, the arbitrators awarded Richard Zappile $95,000 and his wife Stephanie an additional $10,000 for loss of consortium. This money was paid and Zappile filed this bad faith action against AMEX.

¶ 4 The trial court found by clear and convincing evidence that AMEX had acted in bad faith in handling the Zappile claim and awarded $75,000. The trial court determined that AMEX showed bad faith in failing to make a partial payment representing an excess wage loss claim of approximately $4,000; undervalued the claim, thereby forcing the claim into arbitration; never raising the offer; and telling trial counsel that the plaintiffs would not accept anything less than $150,000 to settle.

¶ 5 On appeal, AMEX raises five issues: 1) insufficient evidence; 2) error in determining that defending the claim/taking adversarial position equated to bad faith; 3) error in ignoring AMEX's reasonable reliance on advice of counsel; 4) error in determining AMEX owed a duty to make partial payments; and 5) allowing expert testimony.

¶ 6 In reviewing a non-jury verdict, we are mindful that we must determine whether the findings of the trial court are supported by competent evidence and whether the trial court erred in the application of the law. *Bergman v. United Servs. Auto Ass'n*, 742 A.2d 1101 (Pa.Super.1999). We may interfere with the trial court's conclusions only if they are unreasonable in light of the trial court's findings. *Temple Univ. Hosp. v. Healthcare Mgmt. Alternatives* findings, 764 A.2d 587 (Pa.Super.2000). Additionally, bad faith may be found where there is clear and convincing proof that the insurer's actions lacked any reasonable basis and that the insurer recklessly disregarded its lack of reasonable basis in denying the claim. *Williams v. Nationwide Mutual Ins. Co.*, 750 A.2d 881 (Pa.Super.2000). Further, mere negligence or bad judgment is not bad faith; bad faith imports a dishonest purpose and means a breach of a known duty (i.e. good faith and fair dealing), through some motive of self-interest or ill will. *Id.*

¶ 7 With those standards in mind, we now turn to the official record and the evidence presented. Because much of the evidence and the conclusions drawn therefrom are interrelated, we will address this as a whole, rather than piecemeal.

### Discussion

¶ 8 We first note that the plaintiffs' expert testimony on bad faith and insurance practices, upon which the trial court relied, contains several factual and legal errors. First, the expert testified that, "It's up to the court and juries to decide whether that conduct is sufficiently wrongful to impose a variety of statutory damages set forth in 8371 (the bad faith statute)." N.T. Trial, 1/23/06 at 18. Our Supreme Court has ruled that neither the Pennsylvania Constitution nor the bad faith statute allows for a jury trial in a bad faith action. *See*

*Mishoe v. Erie Ins. Co.,* 573 Pa. 267, 824 A.2d 1153 (2003).

¶ 9 The expert also repeatedly testified that a UIM claim is a first party claim and that it is not an adversarial situation.

> Here it's not an adversarial claim. This, again, is not the bad guy suing their insured, trying to take money out of their insured's pockets, here the only people they have to protect is AMEX's own pocket. This is a first party claim.

N.T. Trial, 11/23/06, p. 102.

■ ¶ 10 First, technically, under both the MVFRL (Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. §§ 1701 *et seq.*) and virtually every insurance policy, a first party claim refers to claims for medical payments. There are specific rules regarding the resolution of disputes over these medical payments that do not apply to other forms of coverage. The arbitration clauses typically found in insurance policies do not apply to these first party claims. *See* 75 Pa.C.S. §§ 1711–25. Uninsured (UM) and underinsured coverage is a separate entity with separate rules and statutory requirements. *See* 75 Pa.C.S. §§ 1731–38. Underinsured coverage is referred to *colloquially* as a first party claim in that it is typically the insured who is making the claim against his or her own policy.

¶ 11 Then, until recently, every motor vehicle insurance policy was required by the Insurance Commissioner to contain an arbitration clause. This alone indicates that UIM coverage is seen to be adversarial in nature. Arbitration necessarily means that two parties have differing views of the nature and value of the claim or a dispute as to whether the claimant is even entitled to the coverage at all. These are adversarial positions that require an independent adjudication. Although our courts have recently ruled that the arbitration clause cannot be a required compo-nent of an insurance policy, this only means that any disputes of UIM coverage can now be heard by a trial court. Once again, this indicates the adversarial nature of the claim.

¶ 12 Our Court recently commented on this very issue in *Condio v. Erie Ins. Exch.,* 899 A.2d 1136 (Pa.Super.2006).

> U-claims are not purely first party claims. Nor are they purely third party claims. Instead, U-claims are hybrid claims that involve elements of both first party and third party claims. U-claims do undeniably have certain components found in first party claims. They are like first party claims in that the insured claimant is often, but not always, making a direct claim against his own insurer under his own policy, under a now optional coverage he elected and for which he paid a premium. While a good number of U-claims are made by insureds against their own insurer under their own policy, "U" coverage also traditionally extends to passengers or even pedestrians who are strangers to the policy. U-claims are also akin to first party claims insofar as the disclosure of policies and coverage terms are concerned. There is no argument but that insurers are obligated to respond to requests for policy information and similar coverage consistent with the general contractual duties of good faith and fair dealing and the specific statutory provisions which govern such disclosure. Beyond those threshold connections and duties, however, and when it turns to issues such as liability, damages, coverage or even procedure, U-claims become very much like third party claims. Simply stated, they are inherently and unavoidably arm's length and adversarial.

*Id.* at 1143–44.

¶ 13 Although the *Condio* decision was issued after this case was tried, the above

quote is a statement of the obvious. A UIM claim is not strictly a first party claim and it is "inherently and unavoidably adversarial." It is inexplicable that an expert would testify otherwise.

■ ¶ 14 To the extent that this testimony was meant to imply that there is some form of heightened duty to a "first party" claimant as opposed to a third party adversarial claimant, it must also be rejected. *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378 (Pa.Super.2002), informs us that the duty of the insurer is the same no matter the party status. That duty is one of good faith and fair dealing. The notion of a higher duty to a first party claimant was also specifically rejected by our Court in *Condio, supra.*

■ ¶ 15 The expert in this case also testified that making a partial payment of undisputed amounts was required.

> Court: So after all that, are you giving an opinion as to any amount, total amount, that should have been paid, such amount that was not in dispute?
>
> Expert: Yes, Your Honor.
>
> Court: What is that opinion?
>
> Expert: I will repeat. On the wage it should have been $4,329.87. In addition to that, on the pain and suffering, or non-economic award, is should have been $32,180. That is the lowest level of their reserve, which is the only offer that had been made.

N.T. Trial, 1/23/06 at 87–88.

¶ 16 This opinion was based on case law, *Keefe v. Prudential Property and Casualty Ins. Co.*, 203 F.3d 218 (3d Cir.2000), and *Williams v. Nationwide Mutual Ins. Co.*, 750 A.2d 881 (Pa.Super.2000), as well as the AMEX Claims Standard Manual.

¶ 17 First, *Keefe* is a federal court decision and is not binding upon the state courts, a fact that the expert admits in cross-examination. Second, even if we were bound by *Keefe*, it does not hold there to be a duty to make partial payments. Rather, the court in Keefe stated:

> Without a request for partial payment, *and unless and until Pennsylvania recognizes a duty to make partial payments*, we believe that an insurance company does not act in bad faith when it assumes that an insured desires settlement of the entire claim, at least where the contract provides for general damages, and does not explicitly require separate assessments and payments for separate injuries in the calculation of compensatory damages.

203 F.3d at 227. (Emphasis added.)

¶ 18 *Keefe* merely states that if Pennsylvania recognized a duty to make partial payments, which duty, we note, has never been recognized, then bad faith may accrue where a specific request for such payment is made, but denied.

¶ 19 Similarly, *Williams* simply does not require that an insurer make a partial payment of an undisputed amount. The concurring statement to *Williams*, filed by then-President Judge Steven McEwen does state:

> [I] hasten to join in each of the conclusions reached in that opinion [of the majority] and write only to emphasize that our decision today does not preclude a finding, under circumstances differing from those of the instant case, that an insurer has a duty to make a partial payment of a UM or UIM claim when timely requested by the insured, where there can be no dispute as to the entitlement of the insured to the amount requested under the policy, even where the insured contends that additional sums are due under the terms of the policy.

750 A.2d at 889.

¶ 20 This is found in a concurring statement and is not the holding of the case,

which was that plaintiffs had not set forth sufficient facts to support a bad faith claim for failure to make partial payment.[1] The holding in *Williams* does not foreclose the possibility that such a claim may, in certain circumstances, be viable, but it also does not state that partial payments are required. The footnote to Judge McEwen's statement presents a scenario where such a claim might be possible. In that footnote, it is posited that where stacking is at issue, the failure of the insurer to pay the amount not in dispute upon demand of the insured, would, in Judge McEwen's opinion, constitute bad faith. That is, if we take the situation presented here and the dispute was over stacking and not the value of the injury, then as long as the value of the claim was agreed to be greater than the unstacked coverage, and where the insured has demanded that amount, the insurer would be obligated to pay that amount and arbitrate the issue of stacking.

¶ 21 However, the question of coverage limits is a far different situation than the question of value of the injury. And it is a long stretch to opine that partial payments are required for specific elements of general damages based upon a concurring statement that posits it may be bad faith to fail to make a partial payment where the dispute is centered on amount of coverage, not the value of the injury suffered. While it may be possible to separate certain elements of a general damages claim, such as wage loss or the cost of a subsequent X-ray, we are unprepared to state

that the failure to pay a $4,000 portion of a $150,000 demand, in and of itself constitutes bad faith. Further, we are unprepared to say that as a general rule the failure to cut out certain portions of a general damages claim, especially where the insurance contract makes no representation that such a procedure will be followed, constitutes bad faith.

¶ 22 The Zappiles present no real argument that such a piecemeal approach is inherently advantageous, and we are disinclined to require a piecemeal settlement practice. We have no idea how such a practice would impact the cost of evaluating and settling a claim, and without such information we are extremely hesitant to require a practice and procedure that may negatively impact the cost of insurance.[2]

¶ 23 We note that the trial court made no finding that Zappile ever made a demand for partial payment. The trial court states that the wage loss information was submitted to AMEX but it did not find that the wage loss was demanded as a partial payment. Even if we accept the notion that a partial payment is legally required, which we do not, the case law indicates that a prerequisite for such payment is a formal demand for the partial payment. Without a finding that such a demand was made, the claim is not viable. *See Keefe, supra; Williams, supra.*

---

1. We note that the trial court quoted this concurring statement in its opinion to support its conclusion that the failure to make a partial payment was evidence of bad faith. We point out again that this is not the majority decision, and, therefore, non-binding; there is no independent analysis to support the statement. The example given by P.J.E. McEwen as a situation where a partial payment *may* be required is not directly applicable to the situation before us.

2. It may prove that such a practice would have no adverse impact on the cost of settling claims, and therefore no impact on the cost of insurance. No evidence of cost, one way or another, has been presented to us. We note that the purpose of the MVFRL is to contain the costs of insurance, and so we believe that such considerations are proper.

¶ 24 Finally, the expert claimed that the AMEX Claims Standard Manual dictates that partial payments be made. *See* N.T. Trial, 1/23/06 at 41. This is partially true. The expert quoted the subsection heading, "Pay what we owe when we owe it" and the first sentence of the subsection:

> In claims of clear or substantially clear liability where real disputes or disagreements exist over the ultimate value of the amounts owed, we should not hold up paying the undisputed portion of the loss or amounts owed under other items of coverage until the entire claim is resolved.

Claims Standards Manual, Chapter VII, p. 3.

¶ 25 The manual further refers to the section on settlement where it states that advance payments, on ongoing claims, will only be made for verified incurred expenses which are documented by means of written copies of, among other things, wage/income loss. There is no indication that the Zappile injury was ongoing in nature and there is no finding that it was. The manual also notes that there is no legal obligation to either initiate or continue advance payments,[3] which, as demonstrated above, is a correct statement of Pennsylvania law.

■ ¶ 26 A trial court may consider the insurer's claims manual when considering bad faith. *See Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378 (Pa.Super.2002).[4] In *Bonenberger*, the claims manual detailed how the insurer meant to lower average claim payment to lower than that of major competitors, to be defense minded, to aggressively use independent medical examinations, to attempt to catch claimants off guard and to assign cases to counsel who would refrain from using independent judgment. All these statements were used to show that the insurer did not encourage a reasonable case-by-case evaluation of claims as a matter of company policy.

¶ 27 Here, the manual did encourage case-by-case evaluations and the error was in failing to follow one of the models. The trial court made no finding that this error was a part of an ongoing pattern or was anything other than a single mistake.

¶ 28 Further, while the manual suggests an approach that is beyond what is required by law, the insurance contract itself—that which the insured has in his or her hands—makes no representation that an insured is in any way entitled to a partial payment. We have already noted that the case law makes no such requirement. It cannot be the reasonable expectation of an insured, who has no copy of the claims manual, that his or her policy requires a partial payment.

■ ¶ 29 The expert also misstated critical evidence. In referring to the transmittal letter from AMEX to defense counsel, the expert testified:

> Well, in that letter, counsel was told not to evaluate or negotiate, they were told to defend it. They were told, for example, that Mr. Metzger wouldn't accept less than $150,000, although he made it clear he was willing to negotiate. I think that somebody said that he was unwilling to give a statement under oath; I don't know where he got that.

N.T. Trial, 1/23/06 at 99.

¶ 30 The relevant portion of the letter states:

---

**3.** Claims Standards Manual, Chapter VII, p. 10.

**4.** We also note that *Bonenberger*, cited by plaintiffs, also supports the idea that UIM claims are adversarial, contradicting the expert's other testimony.

AMEX considers the full value of this claim to be in the $50,000 range. Mr. Zappile's demand to settle was $150,000. We made an initial offer of $32,180.00 however were told by Mr. Metzger's attorney that he was looking for six figures and that they would proceed to arbitration.

Claims Log, Copy of Transmittal Letter, 11/21/03.

¶ 31 There is nothing in the letter that tells defense counsel not to evaluate the claim or not to negotiate. The letter does not state that Mr. Metzger would not accept anything less than $150,000; the letter states the demand to settle was $150,000, which is an accurate statement, and that Mr. Metzger is looking for a six figure settlement. The formal demand was never lowered from $150,000, but Mr. Metzger did tell the claims representative handling the case that he expected a $100,000 to $120,000 arbitration award. The $100–120,000 figure was specifically not a demand, but that does fairly indicate that it is a sum that could settle the matter, thus the reference to the six figure settlement.

¶ 32 The expert's testimony on this point is particularly troubling because the trial court accepted the statement and specifically used the statement that plaintiff would not accept anything less than $150,000 as evidence of bad faith. We are bound to accept the trial court's findings when those findings are supported by the record. Here, the letter simply does not state what the expert claimed and the trial court found it stated. Thus, the trial court's reliance on this must be rejected.

¶ 33 The quoted testimony was accurate on the point of the statement under oath. The also letter stated: "Mr. Zappile retained attorney Lawrence Metzger and Mr. Metzger would not allow a statement under oath of Mr. Zappile. An Exam Under Oath was deferred at that time." Transmittal Letter, 11/21/03. However, a statement under oath was not refused, rather AMEX was informed that there would be only one such statement given. This does not explain the initial misstatement by AMEX that a statement was not allowed, but does explain the next sentence that the statement was deferred. The misstatement appears to have had no effect on counsel because the statement under oath was taken shortly after the file was assigned to counsel.

¶ 34 The expert also testified that while Plaintiff's counsel continued to negotiate, AMEX refused.

There was never any attempt to continue to negotiate when Mr. Metzger made it clear throughout the notes that he was going to do so. He kept coming down, AMEX never went up.

N.T. Trial, 1/23/06 at 48.

¶ 35 The evidence reflects that the demand never lowered from $150,000. It was "signaled" that Zappile would accept a lesser amount to settle the claim, but no specific figure was ever put forth. Similarly, AMEX "signaled" it could raise the offer, but when the initial offer was rejected and no counter demand was made, the process stopped on both sides. It cannot be said that Zappile "kept coming down" while Amex "never went up."

¶ 36 The statement under oath leads into the question of the delay in settling/arbitrating the matter. Although the accident occurred in December, 2001, the UIM claim was not presented to AMEX until May, 2003. The underlying action against the tortfeasor was settled in July 2003, and subrogation was waived. Wage loss and lack of out of pocket expenses were confirmed in October 2003, about which time the $32,180 offer was made and rejected. Zappile demanded arbitration at this time.

The case was assigned to counsel in November 2003 and the statement under oath was taken in January, 2004.

¶ 37 During the statement under oath, AMEX learned for the first time that Zappile had suffered a second accident, approximately two months after the first and prior to his shoulder repair. Zappile injured his left side in the second accident. AMEX then sought to obtain the medical records from the second accident to see what, if any, effect it may have had on the injuries from the first accident. Although Zappile believed the second accident had no effect on the prior injuries,[5] AMEX was within its rights to investigate. This is not evidence of bad faith.

¶ 38 The initial releases for medical information sent to Attorney Metzger were deemed too broad and he requested they be re-written to limit their scope. This was well within plaintiffs' prerogative. However, the fact that the releases were unsatisfactory is not evidence of a bad faith attempt to delay the resolution of the matter, and the trial court did not find that it was. For example, there was no showing that such releases were routinely rejected by plaintiffs' counsels and that AMEX/defense counsel knew or should have known that they would be rejected in this instance, thereby inferring an intent to delay.

¶ 39 The re-written releases were signed by Zappile and they were sent to the respective medical providers. At least some of the releases were unsatisfactory to the medical providers, apparently for HIPAA reasons. Once again the releases needed to be re-written. Although plaintiffs' expert appears to opine that AMEX should have had pre-approved forms for all

medical providers to prevent such a delay, the trial court did not find that this was evidence of bad faith.

¶ 40 Meanwhile, while the medical release problem was being worked out, there was another problem with selecting a neutral arbitrator. AMEX hired a company, Resolute, to help facilitate the arbitration process. Unfortunately neither plaintiffs' counsel nor defense counsel had any idea what Resolute was meant to do. This clearly represents a failure on the part of AMEX to communicate with both counsel and may well have added to the delay. To what extent it added to the delay is unclear, because the medical records were not yet obtained or evaluated, so there would not have been an arbitration hearing in any event. A neutral arbitrator was finally selected.

¶ 41 Unfortunately, yet again, it became apparent that the neutral arbitrator would not be able to serve due to his being out of town, so another arbitrator needed to be appointed. By this time the medical records had been obtained and reviewed. The new neutral was appointed and the case went to arbitration in September 2004.

¶ 42 It is clear that the arbitration could have taken place earlier than it did. It is also clear that AMEX communicated poorly to counsel that Resolute was hired to help facilitate the selection of a neutral arbitrator. However, it is also clear that a portion of the delay is attributable to the late discovery of the second accident. It cannot come as a shock that AMEX felt the need to investigate the medical consequences of that accident, especially because it occurred between the first accident and the shoulder surgery. The trial

---

**5.** Once a review of the medical records was obtained, it was confirmed that the second accident did not exacerbate the prior injuries.

court made no specific findings regarding the cause of the delay and we are not in the position to specifically apportion 'x' number of days for this reason and 'y' number of days for that. Therefore, we cannot say that there is clear and convincing evidence that any delay in the arbitration scheduling was the result of improper actions on the part of either AMEX or defense counsel.

¶ 43 Finally, the trial court found that AMEX improperly undervalued the claim. As evidence of this, the trial court points to the $105,000 total award, which is roughly $70,000 more than the offer. A difference between the offer and the amount awarded is *not*, by itself, evidence of bad faith. *See Condio*, 899 A.2d at 1143.

¶ 44 We also note that the award was $95,000.00 for Zappile, not $105,000.00.[6] The demand never lowered from $150,000.00, which makes the award $55,000 less than the demand. The offer was never raised from $32,180.00, which is a $62,820 difference. From this, it appears that both parties were off by approximately the same amount in their assessment of the value of the case.

¶ 45 The evidence produced at trial indicates that the defense valued the case based on opinions by counsel and their own evaluation of the injury sustained, which was heavily weighted toward a lower amount due to the successful outcome of the corrective surgery and the apparently limited physical impact the injury had on Zappile. We cannot help but notice that in some ways this is unfair. Zappile was obviously not milking his injury. He did not over-treat, did not miss much time from work, and did not make outlandish claims of how his life was adversely affected by the accident. As at least a partial result of his honesty, the insurer undervalued his claim. However, this does not represent clear and convincing proof that the insurer undervalued the claim out of some ill-will or that its actions had no reasonable basis.[7] *See Williams, supra.*

¶ 46 We further note that even if AMEX had formally offered the $60,000.00 that defense counsel mentioned in an internal memo,[8] there is no evidence that Zappile would have accepted the amount. While raising their offer would certainly have looked better, we cannot say that in this instance it is evidence of bad faith for

6. The $105,000 included $10,000 to Mrs. Zappile. AMEX was never presented with any evidence regarding her claim and so we cannot see how it can be faulted for failing to include her in the offer. Moreover, no correspondence included in the official record ever makes mention of her claim or what value it might have had.

7. Although we do not base our decision on this observation, this looks like an instance where both sides played their cards so close to their vests that communication between the two became impossible. Zappile "signaled" that it would accept a lower amount than $150,000, but never lowered his demand. AMEX countered by "signaling" it could raise the ante, but it, too, never officially raised its offer. Zappile neglected to inform AMEX of a subsequent accident which raised red flags and raised the level of distrust, even though the subsequent accident proved to have had no impact on the shoulder injury. Zappile assumed that AMEX would know about the consortium claim because Mrs. Zappile had been a party in the original action. The parties were so circumspect that they forgot to talk to each other, the result being that AMEX simply took Zappile up on his demand for arbitration. There are undoubtedly times when such circumspection is reasonable and necessary, but this matter does not appear to have been one of those times.

8. Defense counsel thought she could settle the case for $75,000.00 total value, meaning the entire claim could be settled for that amount, $60,000.00 from AMEX plus the $15,000.00 from the tortfeasor.

an insurer not to make an offer that would not have been accepted in any event. Therefore, the failure to raise the offer had no ultimate effect on the proceedings.

¶ 47 The trial court based its ruling on four separate findings which it believed indicated AMEX had acted in bad faith: the failure to make partial payment; telling defense counsel that plaintiff would not accept anything under $150,000; undervaluing the claim; and never raising its offer. The first two reasons are demonstrably false. While it is apparent that AMEX undervalued the claim, it is not apparent that it did so out of ill will or without reasonable basis. Finally, there is no showing that raising its offer would have had any effect on the outcome of the case. As a result, there has been no demonstration by clear and convincing evidence that AMEX acted in bad faith in its handling of this claim. *Williams, supra.*

¶ 48 Judgment reversed.

¶ 49 McEWEN, P.J.E., files a Concurring Statement.

Concurring Statement by McEWEN, P.J.E.:

¶ 1 Since the author of the majority Opinion has, in his usual fashion, undertaken a careful study and provided a perceptive analysis of the issues here presented, I hasten to join in that Opinion, and write separately only to emphasize that this is not the type of situation to which I referred in my Concurring Statement in *Williams v. Nationwide Mutual Insurance Co.,* 750 A.2d 881 (Pa.Super.2000), since in this case there was a legitimate "dispute as to the entitlement of the insured to the amount requested under the policy." *Id.* 750 A.2d at 889.