J-A28037-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| GMW ORGANIZATION, LLC, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| STEVEN B. ATLASS, PENNSYLVANIA BANCSHARES, INC., HOWELL ACQUISITION PARTNERS, L.P., AND KREBS PARTNERS, LLC, | |
| Appellees | No. 304 EDA 2015 |

Appeal from the Judgment Entered February 19, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 01597 August Term, 2012

BEFORE:  GANTMAN, P.J., PANELLA, and SHOGAN, JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED NOVEMBER 24, 2015**

This is a contract dispute between Appellant, GMW Organization, LLC ("GMW"), an organization that provides strategic advisory services and business advice that is owned by Gregory Weinberg ("Weinberg"), and Appellees, Steven B. Atlass ("Atlass") and his related entities, Pennsylvania Bancshares, Inc. ("Bancshares"), Howell Acquisition Partners, L.P. ("Howell"), and Howell's general partner, Krebs Partners, LLC ("Krebs") (also collectively "Appellees").  We affirm.

The trial court summarized the factual and procedural history of the case as follows:

> On August 16, 2012, GMW . . . commenced the instant action by way of a complaint against . . . Atlass, . . . Bancshares,

. . . Howell, and . . . Krebs . . .; businesses which were all alleged to be affiliated with Atlass. The complaint asserted a number of causes of action against [Appellees] related to a written compensation agreement [("Agreement")] . . . [the] parties entered into after Atlass approached GMW's President and owner, Gregory Weinberg . . . in early April 2011 regarding GMW finding funding for two hospital projects [that] Atlass was involved in.

On July 16, 2014, [GMW's] causes of action for breach of contract and declaratory relief proceeded to bench trial before this court.[1]

> [1][GMW's] cause of action for unjust enrichment, which was asserted in the alternative, also proceeded to trial.

At trial, the following facts were adduced and arguments were made.

On July 20, 2011, GMW and Atlass, Bancshares, and Atlass's "affiliates," which were collectively referred to as "Atlass," entered into the [Agreement] whereby GMW would provide "investment banking services to Atlass with regards to capital raising events ('Transaction(s)')" for two hospitals, the two hospitals being: (1) Northeastern Hospital, which Atlass had recently purchased through certain entities and (2) St. Agnes Hospital, which Atlass was planning to purchase through another entity, Howell. Atlass' idea was to raise capital with the goal of ultimately converting the hospitals into medical office buildings.

On or about December 16, 2010, Northeastern Hospital, also known as City Center at Northeastern Hospital, was purchased by Haskell Acquisitions Partners I, L.P., Haskell Acquisitions Partners II, L.P., and Haskell Acquisitions Partners III, L.P. (collectively "Haskell"). On or about July 29, 2011, Saint Agnes Hospital was purchased by Howell. Atlass formed Howell to purchase Saint Agnes Hospital. Howell is owned and/or controlled by entities in which Atlass and Atlass' immediate family members have a majority ownership stake, including, but not limited to, its general partner Krebs, which is 100% owned and controlled by Atlass. Haskell, Howell, and Krebs are all Atlass "affiliates" within the meaning of the [Agreement].

- 2 -

Trial Court Opinion, 4/21/15, at 1–2 (internal citations omitted).

GMW contracted with Atlass to assist with raising funds for a joint venture concept that Weinberg "believed would be effective for funding development of the [h]ospital [p]rojects that Atlass had described to Weinberg" at a prior meeting. Complaint, 8/16/12, at ¶ 11. Weinberg allegedly explained to Atlass that the joint venture concept likely would provide Atlass and the Atlass affiliates "with liquidity, would enable Atlass to buy out his partner at Northeastern Hospital, . . . could enable Atlass and the Atlass affiliates to share in operational profits and profits from refinancing . . . and would allow them to earn a management fee and an asset management fee." *Id*. at ¶ 12.

The parties exchanged drafts of a compensation agreement, Complaint, 8/16/12, at ¶ 30, negotiated terms over several days, *id*. at 33, and ultimately entered into the Agreement on July 20, 2011. *Id*. The terms of the Agreement are relevant herein, and it is reproduced *infra*.

GMW's claims for breach of contract and a declaratory judgment were based on its contention that the Agreement entitled it to $250,000 and twenty-five percent interest in the entity that owned or controlled St. Agnes Hospital. The case proceeded to a two-day bench trial on July 16 and 17, 2014. On September 26, 2014, the trial court found for GMW, awarding it $0.00 and a twenty-five percent interest in Krebs, per the Agreement.

On October 8, 2014, GMW filed a post-trial motion, which the trial court denied by order filed on December 18, 2014. GMW filed a notice of appeal on January 8, 2015.[1] Both GMW and the trial court complied with Pa.R.A.P. 1925.

GMW presents the following issues, which are identical to the issues raised in GMW's Pa.R.A.P. 1925(b) statement:

I. Whether the Trial Court erred in failing to enter a specific declaration concerning Plaintiff's rights and interest in the carried interest/profit share (also known as the "Promote" or the "Carry") with respect to a real estate investment transaction know[n] as the St. Agnes Transaction (both "St. Agnes" and the "St. Agnes Transaction" are defined below), where: (a) the Court recognized the importance of the Promote to the parties; (b) undisputed extrinsic evidence existed to support Plaintiff's interest in the Promote; and (c) the Court only awarded Plaintiff an interest in Krebs Partners, LLC ("Krebs") without any declaration concerning Plaintiff's rights to the Promote, thereby permitting Defendant to manipulate the disbursement of Promote money (including but not limited to altering the entity types in the St. Agnes Transaction) such that Krebs receives only a minimal amount and Defendant avoids having to pay Plaintiff his share of the Promote money.

II. Whether the Trial Court erred in ruling that the terms of parties' [A]greement concerning Plaintiff's entitlement to $250,000 from the St. Agnes Transaction was clear and unambiguous, where Plaintiff satisfied the conditions precedent to its receiving the $250,000, and, in construing

---

[1] Because judgment had not been entered on the docket as required by Pa.R.A.P. 301, we directed GMW to *praecipe* the trial court to enter judgment. Judgment was entered on February 19, 2015, and the previously filed notice of appeal was treated as filed after the entry of judgment. **See** Pa.R.A.P. 905(a).

such terms, the Court was required to borrow and insert clauses from other inapplicable sections of the [A]greement to support its conclusion that Plaintiff was not entitled to receive $250,000 from the St. Agnes Transaction.

III. Whether the Trial Court erred in failing to award Plaintiff $250,000 based on the "amount" received by Defendants in the St. Agnes Transaction (i.e. $2,500,000), where: (a) all "debt" considerations were irrelevant to the St. Agnes Transaction because the provisions in the [A]greement relating to Plaintiff's payment entitlements from the St. Agnes Transaction did not contain a term allowing for "debt" to reduce Plaintiff's entitlements, and the Court found that a capital-raising event (i.e. a "Transaction" (as defined in the parties[' A]greement)) took place; (b) even the inapplicable "debt" terms which the Court borrowed from other provisions in the [A]greement not relating to the St. Agnes Transaction called for using pre-existing debt of which the St. Agnes Transaction had none since all existing debt was eliminated in the St. Agnes Transaction and the $2,500,000 was net of such debt (as admitted by Atlass at trial); and (c) there was no genuine debt from the St. Agnes Transaction which could be used to reduce Plaintiff's $250,000 payment entitlement.

IV. Whether the Trial Court erred in construing the [A]greement of the parties against Plaintiff contrary to the doctrine of *contra proferentem* such that it failed to award Plaintiff $250,000 and the Promote pursuant to the St. Agnes Transaction where the [A]greement was drafted by the Defendants with the assistance of counsel[,] and Plaintiff had no counsel.

GMW's Brief at 4–6.

The Agreement provides as follows:

**Compensation Letter Agreement**

July 20, 2011

Gregory Weinberg, President
**GMW Organization, LLC**

- 5 -

1650 Market Street, 53rd Floor
Philadelphia, PA  19103

Dear Greg,

This letter agreement ("Agreement"), dated July 20, 2011 (the "Effective Date"), confirms the terms and conditions between GMW Organization, LLC ("GMW") and Pennsylvania Bancshares, Inc., myself, and/or my affiliates (collectively "Atlass") whereby GMW will be providing investment banking services to Atlass with regards capital raising events ("Transaction(s)") for North East Hospital located at 2301 East Allegheny Avenue, Philadelphia, PA 19134 ("NE Hospital") and St. Agnes Hospital located at 1930 South Broad Street, Philadelphia, PA 19145 ("St. Agnes").  Atlass and GMW are hereinafter referred to individually as a "Party" and together as the "Parties."

This Agreement is an exclusive engagement for a period of 120-days commencing on the Effective Date.  All GMW prospective sources of capital for a Transaction shall be identified by GMW and listed on Schedule "A" attached hereto, as such schedule will be updated from time-to-time by the Parties.  Additions and updates to Schedule "A" shall be discussed and agreed to by the Parties, and such updates and additions shall be submitted in the form of electronic mail, and Atlass' receipt and confirmation (by way of electronic mail) of the updates and additions set forth in such electronic mail submission constitutes acceptance of any such addition and update to Schedule "A".  Expiration of this Agreement shall not affect GMW's right to receive compensation (as described below) if a Transaction takes place with a GMW prospective source of capital, and takes place subsequent to, but within a period of 24-months (the "Tail Period") from the end of the term of this Agreement.

GMW shall:

1) Assist Atlass on structuring the Transaction;

2) Assist in the preparation and creation of appropriate documentation (e.g. teaser and information memorandum ("Sales Materials")); Sales Materials for NE Hospital shall [be] prepared by GMW on or

before twenty-one days from the Effective Date;

3) Initiate contact with prospective investors and arrange introductions with prospective investors by way of teleconference, in-person meetings and/or email communication;

4) Assist Atlass in its evaluation of a Transaction proposal;

5) Assist in negotiations.

**COMPENSATION**

**NE HOSPITAL**

1) 3% of a NE Hospital Transaction (irrespective of who identifies the source of capital; *i.e.* GMW or Atlass);

2) 10% of any funds Atlass receives from an NE Hospital Transaction (net of debt and costs) (to be paid only if a Transaction effects with a GMW prospective source (or sources) of capital, or if a Transaction effects by way of the new general partner of NE Hospital, and Atlass receives funds from such Transaction); and

3) 25% of the general partnership ("GP") of the entity controlling NE Hospital (to be granted only if a Transaction effects with a GMW prospective source (or sources) of capital[)].

By way of example, should GMW raise $20 million dollars in a joint venture ("JV") structure for NE Hospital from a prospective source of capital, GMW's compensation will be as follows:

1) 3% of $20 million (i.e. $600,000.00);

2) 10% of what Atlass receives (e.g. $20,000,000 less debt of $12 million, less $2 million buyout of partners, less expenses); the net amount of $6

million would equal a $600,000 fee payable to GMW; and

3) 25% of the GP of the entity controlling (e.g. JV) of NE Hospital.

## ST AGNES HOSPITAL

Upon closing of the initial St. Agnes Transaction (e.g. $2 million bridge financing), irrespective of who identifies the source of capital, GMW will receive $30,000.00.

Upon the closing of a subsequent St. Agnes Transaction, GMW will receive:

1) 3% of the Transaction amount (irrespective of who identifies the source of capital; i.e. GMW or Atlass);

2) 10% of the amount Atlass would receive from a St. Agnes Transaction (see above example) (to be paid only if a Transaction effects with a GMW prospective source (or sources) of capital); and

3) 25% of the GP in the entity that controls St. Agnes (to be granted only if a Transaction effects with a GMW prospective source (or sources) of capital).

GMW is affiliated (GMW's President is a registered representative) with Grant Williams, LP ("GWLP"), a Philadelphia, Pennsylvania broker-dealer who is a member of FINRA and the Securities Investor Protection Corporation ("SIPC"). GMW, through GWLP, will comply with all applicable laws, rules, and regulations of the Securities and Exchange Commission (the "SEC"), the conduct rules of FINRA, and any state securities laws and regulations.

Neither Party shall have the right to assign its rights or delegate its obligations under this Agreement without the prior written consent of the other Party; provided however, that GMW may assign its rights or obligations hereunder to GWLP or any other FINRA broker-dealer that GMW may associate with during the

Term, Tail Period, and any extension thereof, without the prior written consent of Atlass.

This Agreement shall be binding on the Parties and their successors, assignees, designees or acquired businesses.

If you agree with the terms and conditions of this Agreement, please sign and return.  It is understood that you will prepare a more formal document as soon as practicable.

Sincerely,

**PENNSYLVANIA BANCSHARES, INC**

Steven B. Atlass
President

Accepted:  Signature of Steven B. Atlass

Date:  July 20, 2011

Accepted and agreed as of this 20th day of July, 2011

GMW Organization, LLC

By:  Signature of Gregory Weinberg
     Gregory Weinberg
     President

Complaint, 8/16/12, at Exh. A.

In reviewing a decision after a nonjury trial, "we will reverse the trial court only if its findings are predicated on an error of law or are unsupported by competent evidence in the record."  ***Deutsche Bank Nat. Trust Co. v. Gardner***, 2015 PA Super 219, slip op. at 2 (Pa. Super. filed October 14, 2015) (citing ***Boehm v. Riversource Life Ins. Co.***, 117 A.3d 308, 321 (Pa. Super. 2015)).  We may interfere with the trial court's conclusions only if

they are unreasonable in light of its findings. ***Zappile v. Amex Assur. Co.***, 928 A.2d 251, 254 (Pa. Super. 2007).

GMW's issues relate to the trial court's interpretation of the Agreement. "[T]he ultimate goal [of contract interpretation] is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." ***Southwestern Energy Production Co. v. Forest Resources, LLC***, 83 A.3d 177, 187 (Pa. Super. 2013). "In cases of a written contract, the intent of the parties is the writing itself." ***Lesko v. Frankford Hosp.-Bucks Cnty.***, 15 A.3d 337, 342 (Pa. 2011). "[I]n determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect." ***LJL Transp., Inc. v. Pilot Air Freight Corp.***, 962 A.2d 639, 647 (Pa. 2009). We have made clear:

> Determining the intention of the parties is a paramount consideration in the interpretation of any contract. The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. However, as this Court stated in ***Herr Estate***, 400 Pa. 90, 161 A.2d 32 (1960), "[W]here an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances."
>
> We first analyze the contract to determine whether an ambiguity exists requiring the use of extrinsic evidence. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the

- 10 -

parties intended by the ambiguous provision is for the trier of fact.

***Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc.***, 77 A.3d 1, 6–7 (Pa. Super. 2013).

GMW first argues that the trial court erred in failing to enter a specific declaration concerning GMW's rights and interest "in the carried interest/profit share (also known as the "Promote" or the "Carry")" with respect to the St. Agnes Transaction. GMW's Brief at 4. The trial court defined "promote" as "'a carried interest . . . or what's also known as a profit share whereby . . . a person who's putting a deal together can share in the upside as the property or the entity becomes successful' and the limited partners have been paid back with interest." Trial Court Opinion, 4/21/15, at 16–17 (citing N.T. Volume I, 7/16/14, at 68–69). Appellees assert that the term "promote," as utilized by GMW, is not contained in the Agreement; rather, the Agreement addressed GMW's compensation "without any reference to a 'promote.'" Appellees' Brief at 7–8. The trial court agreed that the Agreement made no mention of a "promote"; rather, the Agreement provided that GMW would be entitled to twenty-five percent of the general partnership in the entity that controls St. Agnes Hospital. Trial Court Opinion, 4/21/15, at 17.

The trial court concluded that Howell controlled St. Agnes Hospital within the meaning of the Agreement. Thus, GMW was entitled to twenty-five percent interest in Howell's general partner, Krebs. While

- 11 -

acknowledging that GMW argued that it was entitled to twenty-five percent of Howell, the trial court concluded that the Agreement's terms are clear and unequivocal. Therefore, the precept that a court may examine the surrounding circumstances to ascertain the intent of the parties when the words used in a contract are ambiguous, *see*, *e.g.*, *Keystone Dedicated Logistics*, 77 A.3d at 6, never came into play. Even if the provision in the Agreement was ambiguous, the trial court found that the undisputed extrinsic evidence did not support GMW's interest in the promote. Trial Court Opinion, 4/21/15, at 18. After careful review, we conclude that the trial court did not err in its determination.

The second issue concerns the trial court's conclusion that GMW was not entitled to $250,000, or ten percent of the $2.5 million Howell received as part of the St. Agnes Hospital transaction because the $2.5 million was debt; the Agreement excluded debt from funds to which GMW's ten percent compensation was applicable. GMW argues that the trial court erred in determining that the Agreement was clear and unambiguous, yet it utilized clauses from other sections of the Agreement to support its conclusion that GMW was not entitled to $250,000. GMW's Brief at 36. GMW alleges the trial court "supplied a term that was intentionally excluded from the St. Agnes compensation terms." *Id*. at 39. GMW maintains that the trial court should have examined the St. Agnes Hospital provision in isolation, without

reference to any other language of the Agreement. Thus, GMW avers that the trial court erred in its interpretation of the Agreement.

The trial court rightly concluded that it was obligated to view the Agreement as a whole and not "in discrete units." ***Bethlehem Steel Corp. v. MATX, Inc.***, 703 A.2d 39, 42 (Pa. Super. 1997). The trial court looked to the entire Agreement and correctly determined there was no ambiguity. Moreover, the trial court found that Weinberg's testimony that the $2.5 million was structured as a loan at his suggestion for tax reasons was not credible. Trial Court Opinion, 4/21/15, at 24. ***See Prieto Corp. v. Gambone Const. Co.***, 100 A.3d 602, 609 (Pa. Super. 2014) ("Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact."). Therefore, this issue lacks merit.

GMW's third claim is that the trial court misconstrued the debt terms of the Agreement, maintaining that the trial court erred in finding that "because Iron Point[2] provided Howell with a loan, that loan was debt that should have been deducted from the 'amount' received by [Appellees] in calculating what [GMW] was due under the Compensation Agreement." GMW's Brief at 40. Thus, GMW posits that the debt referred to in the

_____

[2] Iron Point Partners, LLC is a private equity company that was interested in investing in both Northeastern Hospital and St. Agnes Hospital but ultimately invested solely on St. Agnes Hospital. Trial Court Opinion, 4/21/15, at 5.

Agreement was only pre-existing debt. The trial court found that GMW did not identify any evidence that the terms "net of debt" and "less debt" used in the Agreement referred only to existing debt paid off through a hospital transaction rather than funds received by Atlass or an affiliate as new debt. The trial court determined that Iron Point dictated the "$2.5 million would be structured as a loan in order to provide itself with more protection." Trial Court Opinion, 4/21/15, at 24. The trial court's conclusions are well supported by the record.

Finally, GMW asserts that the trial court should have applied the doctrine of *contra proferentem*. Under that rule, "any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable." ***Municipal Authority of Borough of Midland v. Ohioville Borough Municipal Authority***, 108 A.3d 132, 139 (Pa. Cmwlth. 2015). This issue has been discussed in the context of the first and second issues; we have noted that the trial court's conclusion that the Agreement lacked ambiguity has record support. Thus, the ambiguity issue has no merit. Moreover, the doctrine has no application herein because the evidence of record supports the conclusion that the Agreement was a freely negotiated instrument. ***See Kozura v. Tulpehocken Area Sch. Dist.***, 791 A.2d 1169, 1175 n.8 (Pa. 2002) ("The principle that a contractual ambiguity is to be construed against the drafter

does not apply where, as here, the contract is the result of the joint efforts of negotiators.").

In summary, the trial court provided an exhaustive analysis and correct disposition of all of the issues raised by GMW. Accordingly, we affirm the judgment, and we do so on the basis of the comprehensive April 21, 2015 opinion of the Honorable Patricia A. McInerney.[3]

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/24/2015

---

[3] The parties are directed to attach a copy of that opinion in the event of further proceedings in this matter.

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| GMW ORGANIZATION, LLC, | : | AUGUST TERM, 2012 |
| | : | |
| Plaintiff, | : | NO. 1597 |
| | : | |
| vs. | : | COMMERCE PROGRAM |
| | : | |
| STEVEN B. ATLASS, ET AL., | : | |
| | : | |
| Defendants. | : | |

OPINION

BY:   Patricia A. McInerney, J.                                    April 21, 2015

Judgment having been entered, this is an appeal from the order denying the plaintiff's

motion for post-trial relief.

**I.       BACKGROUND**

On August 16, 2012, GMW Organization, LLC ("GMW" or "Plaintiff") commenced the

instant action by way of a complaint against Steven B. Atlass ("Atlass"), Pennsylvania

Bancshares, Inc. ("Bancshares"), Howell Acquisition Partners, L.P. ("Howell"), and Howell's

general partner Krebs Partners, LLC ("Krebs") (collectively, "Defendants"); businesses which

were all alleged to be affiliated with Atlass. (Pl.'s Compl. ¶¶ 2-5.) The complaint asserted a

number of causes of action against Defendants related to a written compensation agreement

("Contract") these parties entered into after Atlass approached GMW's President and owner,

Gregory Weinberg ("Weinberg"), in early April 2011 regarding GMW finding funding for two

hospital projects Atlass was involved in. (*See id.* at ¶¶ 9-11, 33, 46-73.)

On July 16, 2014, Plaintiff's causes of action for breach of contract and declaratory relief

1

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b) D. SPARACINO 04/21/2015

Gmw Organization, Llc Vs Atlass Etal-OPFLD

proceeded to bench trial before this court.[1] At trial, the following facts were adduced and arguments were made.

On July 20, 2011, GMW and Atlass, Bancshares, and Atlass's "affiliates," which were collectively referred to as "Atlass," entered into the Contract whereby GMW would provide "investment banking services to Atlass with regards to capital raising events ('Transaction(s)')" for two hospitals, the two hospitals being: (1) Northeastern Hospital, which Atlass had recently purchased through certain entities and (2) St. Agnes Hospital, which Atlass was planning to purchase through another entity, Howell. (*See* Pl.'s Ex. 1; N.T., Vol. 1, 40-44, 216-18.) Atlass' idea was to raise capital with the goal of ultimately converting the hospitals into medical office buildings. (*See* N.T., Vol. 1, 53-54, 204-10; Pl.'s Ex. 22.)

On or about December 16, 2010, Northeastern Hospital, also known as City Center at Northeastern Hospital, was purchased by Haskell Acquisitions Partners I, L.P., Haskell Acquisitions Partners II, L.P., and Haskell Acquisitions Partners III, L.P. (collectively "Haskell"). (*See* N.T., Vol. 1, 206-07; Defs. Exs. 51-52.) On or about July 29, 2011, Saint Agnes Hospital was purchased by Howell. (N.T., Vol. 1, 146, 208.) Atlass formed Howell to purchase Saint Agnes Hospital. (*See Id.* at 205, 208.) Howell is owned and/or controlled by entities in which Atlass and Atlass' immediate family members have a majority ownership stake, including, but not limited to, its general partner Krebs, which is 100% owned and controlled by Atlass. (*Id.* at 128-32; Pl.'s Ex. 15.) Haskell, Howell, and Krebs are all Atlass "affiliates" within the meaning of the Contract. (N.T., Vol. 1, 129, 208-09; N.T., Vol. 2, 84, 133.)

---

[1] Plaintiff's cause of action for unjust enrichment, which was asserted in the alternative, also proceeded to trial.

2

The Contract provided:

GMW shall:

1) Assist Atlass on structuring the Transaction;
2) Assist in the preparation and creation of appropriate documentation (e.g., teaser and information memorandum ("Sales Materials")); Sales Materials for NE Hospital shall [be] prepared by GMW on or before twenty-one days from the Effective Date;
3) Initiate contact with prospective investors and arrange introductions with prospective investors by way of teleconference, in-person meetings and/or email communications;
4) Assist Atlass in its evaluation of a Transaction proposal;
5) Assist in negotiations.

(Pl.'s Ex. 1, at p. 1.) The Contract then set forth nearly identical compensation structures for

GMW for both Northeastern Hospital and St. Agnes Hospital, specifically providing:

*COMPENSATION*

**NE HOSPITAL**

1) 3% of a NE Hospital Transaction (irrespective of who identifies the source of capital; i.e. GMW or Atlass);
2) 10% of any funds Atlass receives from a[] NE Hospital Transaction (net of debt and costs) (to be paid only if a Transaction effects with a GMW prospective source (or sources) of capital, or if a Transaction effects by way of a new general partner of NE Hospital, and Atlass receives funds from such Transaction); and
3) 25% of the general partnership ("GP") of the entity controlling NE Hospital (to be granted only if a Transaction effects with a GMW prospective source (or sources) of capital[)].

By way of example, should GMW raise $20 million dollars in a joint venture ("JV") structure for NE Hospital from a prospective source of capital, GMW's compensation will be as follows:

1) 3% of $20 million (i.e. $600,000.00);
2) 10% of what Atlass receives (e.g. $20,000,000 less debt of $12 million, less $2 million buyout of partners, less expenses); the net amount of $6 million would equal a $600,000 fee payable to GMW; and
3) 25% of the GP of the entity controlling ... NE Hospital.

**ST AGNES HOSPITAL**

Upon closing of the initial St. Agnes Transaction (e.g. $2 million bridge

3

financing), irrespective of who identifies the source of capital, GMW will receive $30,000.00.

Upon the closing of a subsequent St. Agnes Transaction, GMW will receive:

> 1) 3% of the Transaction amount (irrespective of who identifies the source of capital; i.e. GMW or Atlass);
> 2) 10% of the amount Atlass would receive from a St. Agnes Transaction (see above example) (to be paid only if a Transaction effects with a GMW prospective source (or sources) of capital); and
> 3) 25% of the GP in the entity that controls St. Agnes (to be granted only if a Transaction effects with a GMW prospective source (or sources) of capital).

(*Id.* at p. 2.) Regarding sources of capital, the Contract provided "[a]ll GMW prospective sources of capital for a Transaction shall be identified by GMW and listed on Schedule 'A' attached hereto, as such schedule will be updated from time-to-time by the Parties." (*Id.* at p. 1.)

On June 30, 2011, Atlass prepared the first draft of the Contract and sent it to Weinberg. (Pl.'s Ex. 11.) Weinberg then made "somewhat substantial" edits to the first draft and provided Atlass with several subsequent drafts. (N.T., Vol. 1, 98; Defs.' Exs. 6-9.)

Before entering into the Contract, Weinberg sought to bring in a co-investment banker. (N.T., Vol. 1, 103-04, 169-72, 219-20.) To that end, on or about April 2011, Weinberg introduced Atlass to Steve Goldberg ("Goldberg") who was working at Friedman, Billings and Ramsey ("FBR"). (*Id.* at 169-70, 219.) However, on or about May 2011, Goldberg notified Weinberg that he was resigning from FBR and moving to a new firm, Robert W. Baird & Co. ("Baird"). (*Id.* at 169.) As he was resigning from FBR and moving to a new firm, Goldberg mentioned that he could not work with Atlass or Weinberg/GMW until his industry-required "garden leave" expired in August. (*Id.* at 169.) A "garden leave" is a set period of time where an investment banker may not work between transitioning from one firm to another. (*See id.* 169.)

4

Knowing that resigning from FBR would cause an inconvenience, Goldberg recommended Weinberg speak with Jim O'Brien ("O'Brien") at FBR regarding pursuing a JV opportunity. (*Id.* at 32-33, 49-50; N.T., Vol. 2, p. 12.) To that end, Goldberg offered that O'Brien could provide Weinberg with a list of potential investors Weinberg could contact in the event FBR or Baird did not engage with Atlass to effect a JV. (N.T., Vol. 2, 46-47; Pl.'s Ex. 36.)

Weinberg diligently pursued a conference call between himself, Atlass, and O'Brien, and the call eventually took place on or about May 18, 2011. (*See* N.T., Vol. 1, 50; N.T., Vol. 2, 48-49; Pl.'s Ex. 34.) On June 13, 2011, O'Brien sent a contact list to Weinberg that included Iron Point Partners, LLC ("Iron Point"), a private equity company. (N.T., Vol. 2, 46-47; Pl.'s Ex. 36.) Shortly thereafter, O'Brien notified Weinberg that he too was resigning from FBR and moving to Baird and could not discuss any opportunity with Weinberg or Atlass during his 90-day garden leave, which would expire in mid-September 2011. (*See* N.T., Vol. 2, 6, 49-54; Pl.'s Ex. 37.)

After entering into the Contract, Weinberg began preparing teaser/executive summary materials and financial projections. (*See* N.T., Vol. 1, 55-58; Pl.'s Exs. 22, 25.) During the period of time following execution of the Contract, Weinberg also contacted numerous investors regarding the JV opportunities with Atlass. (N.T., Vol. 1, 35-36.) And during the months of September, October, and November of 2011, Weinberg worked diligently with Goldberg and O'Brien, after their respective "garden leave" periods expired, and other representatives of Baird whereby Weinberg created and provided due diligence information (e.g., an organizational chart, financials, etc.) and answered detailed due diligence questions to enable Baird to assess the viability of a joint venture. This work culminated with Atlass entering into a separate investment banking services agreement with Baird on November 14, 2011 (the "Howell-Baird Agreement").

5

(*See, e.g.*, N.T., Vol. 1, 63-67 Pl.'s Exs., 27, 37; Defs.' Ex. 13.)

From October through November 2011, Weinberg was involved in negotiating the Howell-Baird Agreement. (N.T., Vol. 1, 46, 70-71. 103-04.) This involvement included "advising ... Atlass on how to negotiate and edit" the Howell-Baird Agreement. (*Id.* at 46.)

The Howell-Baird Agreement is similar to the Contract in that it sets forth Baird's obligations "in connection with the possible ... investment in or commitment of capital to [Howell] or the St. Agnes Continuing Care Center owned by [Howell]." (Defs.' Ex. 13, at p. 1.) One way, however, that the Howell-Baird Agreement differs from the Contract is that it specifies "[f]or the avoidance of doubt, an investment or commitment of capital in the JV, the Company or any project, property or business affiliated with the Company may include equity, equity-linked or senior, mezzanine, subordinated or convertible debt financing." (*Id.*)

On November 15, 2011, Weinberg and Atlass amended the Contract to include the following as GMW prospective sources of capital: "(i) Any and all persons or entities identified by Robert W. Baird & Co. Incorporated ('Baird') during the term of the agreement between Baird and Howell Acquisition Partners, LP ('Howell Agreement' dated and executed by Atlass November 14, 2011); and (ii) any and all persons or entities identified by Baird during the term of the agreement between Baird and Haskell Acquisition Partners, LP and its affiliates ('Haskell Agreement' – to be executed as soon as practicable); ..." (Pl.'s Ex. 3.) Stated another way, the parties agreed that GMW would be credited with any source of capital identified by Baird so long as Baird identified that source between November 14, 2011 and some future date. (*See id.*)

Certain aspects of the Contract required GMW to find the source or sources of capital if it was to be compensated for finding that capital. (*See* Pl.'s Ex. 1.) As used in the Contract, Atlass believed the term "capital" includes equity, but not debt. (N.T., Vol. 1, 217.) Weinberg, on the

6

other hand, argued the term "capital" as used in the Contract included equity and debt. (*Id.* at 99-100.)

Upon receiving the Howell-Baird Agreement, which specified "for the avoidance of doubt" capital includes equity and debt with respect to the services to be provided by Baird, Weinberg did not clarify with Atlass that the word "capital" as used in the Contract also included debt. (*Id.* at 113-15.) In negotiating the Howell-Baird Agreement, Weinberg marked up the drafts proposed by Baird. In doing so, Weinberg at one point proposed to rewrite the terms of the agreement such that it would have read "for the avoidance of doubt, an investment or commitment of capital in the JV, [Howell] or the St. Agnes Continuing Care Center owned [Howell] must be an equity investment, not debt." (Defs.' Ex. 83.) Thus, Weinberg understood prior to trial that the word "capital" could include only equity, and even asserted this position in his dealings with Baird.

After it was formally engaged by Howell, Baird engaged in due diligence, prepared pre-marketing materials such as "teasers," contacted prospective investors, responded to due diligence requests from investors, and negotiated letters of intent. (N.T., Vol. 2, 14-16.) In January 2012, Baird began to make phone calls to capital sources, including, but not limited to, Iron Point. On January 20, 2012, a representative from Baird (Kathleen Chekan) sent Weinberg and Atlass the list of the people that Baird was contacting (or desired to contact). (*See* Pl.'s Ex. 40.) This was the first time Iron Point was identified to Atlass and the Atlass affiliates during the term of the Contract and during the term of the Howell-Baird Agreement.

During January, February, and March of 2012, Weinberg participated in conference calls and/or in-person meetings/tours with Iron Point, among others. Weinberg also provided, among other things, a summary outline to Atlass in preparation for an Iron Point call and recommended

7

and participated in conference calls to prepare for the Iron Point call. (N.T., Vol. 1, 77-82; N.T., Vol. 2, 227; Pl.'s Exs. 40-43.) Weinberg also provided comments on multiple iterations of a draft term sheet/letter of intent from Iron Point, which culminated with Iron Point submitting its first proposed term sheet to Atlass on March 6, 2012. (N.T., Vol. 1, 80-81; Pl.'s Ex. 43; Defs.' Ex. 25.)

Weinberg received a copy of the first term sheet. (N.T., Vol. 1, 125.) The first term sheet proposed forming a new limited liability company or companies to own the hospitals and real property at both St. Agnes Hospital and Northeastern Hospital. (Defs.' Ex. 25, at p. 2.) Iron Point was the entity that proposed the limited liability company form rather than the limited partnership form. (N.T., Vol. 1, 20, 127.)

On March 19, 2012, Iron Point submitted a revised proposed term sheet for both hospitals. (Defs.' Ex. 26.) Weinberg received a copy of the revised term sheet. (N.T., Vol. 1, 127-28.) Weinberg knew Iron Point proposed structuring the new entity or entities as a limited liability company or companies. (N.T., Vol. 1, 127.) Weinberg also understood a limited liability company does not have a general partner. (N.T., Vol. 1, 127-28.) The revised term sheet valued Northeastern Hospital at $12,350,000 and St. Agnes Hospital at $5,086,500 and proposed providing Atlass with a $2,500,000 "distribution." (Defs.' Ex. 26, at 3-4.)

Iron Point dictated the structure of the deal; the dollar amount; and how the money would be allocated. (N.T., Vol. 2, 20, 30; Defs.'s Exs. 25-26.) There were only limited negotiations between Atlass and Iron Point. (N.T., Vol. 1, 126-27, 225-26.) And for those limited negotiations, Baird took the lead in negotiating on Atlass' behalf. (Id. at 88, 226-27; N.T., Vol. 2, 14, 22.) Weinberg had no involvement with these negotiations with Iron Point. (N.T., Vol. 2, 27-28.)

At some point in the negotiations, Iron Point decided against pursuing a joint venture with Northeastern Hospital and focused solely on St. Agnes Hospital. (N.T., Vol. 1, 230.) As a result, instead of pursuing a deal for the two hospitals in the $17,000,000 range, Iron Point decided to only pursue a deal for the one in the $5,000,000 range. (*Id.* at 232-34.) It was also at this point Iron Point restructured the proposal such that the $2,500,000 distribution was changed to a proposed $2.5 million loan. (*Id.* at 230-34; N.T., Vol. 2, 30.)

On June 1, 2012, Iron Point and Howell closed a transaction whereby they formed St. Agnes MOB, LLC, a limited liability company that would own and operate the St. Agnes Hospital business and real property formerly owned and operated by Howell. (N.T., Vol. 1, 229-31; Pl.'s Ex. 15.) Pursuant to the terms of the Transaction, Iron Point contributed $6,027,579 of which a little over $2 million was used to pay off Howell's existing lender Basilicata Capital and $2.5 million was loaned to Howell. (*See* N.T., Vol. 1, 66-67, 146, 230; Pl.'s Ex. 15.) In return, Howell contributed the property and Iron Point took a 90% ownership position in St. Agnes MOB, LLC, while Howell took a 10% ownership interest. (*See id.*)

Iron Point is a GMW prospective source of capital in accordance with the Contract and the email amendment dated November 15, 2011. (*See* N.T., Vol. 2, 87; Pl.'s Ex. 3.) But for GMW's relationship with Baird, Iron Point would never have funded the St. Agnes MOB JV Transaction. (N.T., Vol. 1, 175-76; N.T., Vol. 2, 90.)

The St. Agnes MOB, LLC operating agreement specifies that except as otherwise provided in the agreement, the new LLC would be controlled by a five-member Board of Managers dominated by Iron Point. (Pl.'s Ex. 15, at §§ 5.01, 5.02(a).) Howell, however, was designated as the initial managing member. (*Id.* at § 5.05(a).) While Howell was to "report to, and be subject to the direction and control of, the Board of Managers," Howell was "responsible

9

for the implementation of the decisions of the Board of Managers and for conducting the day-to-day- business and affairs of the Company in accordance with the Annual Plan and Budget." (*Id.* at § 5.05(a).) Howell currently remains the managing member of St. Agnes MOB, LLC and receives $15,000 per-month to manage St. Agnes MOB. (*See, e.g.,* N.T., Vol. 2, 126-27.)

In accordance with the term of the Contract that GMW would receive "25% of the GP in the entity that controls St. Agnes" if a Transaction effected "with a GMW prospective source ... capital[,]" GMW sought a 25% interest in Howell. (N.T., Vol. 1, 5, 121.) Atlass and his affiliates, on the other hand argued, the entity that controls St. Agnes MOB, LLC is the Board of Managers, which does not have a GP. (*Id.* at 16, 247-48.) Atlass and his affiliates further argued even if it was assumed that Howell controls St. Anges MOB, LLC, the Contract provided GMW would only be entitled to a 25% interest in the general partner of Howell, which is Krebs. (N.T., Vol. 2, 141, 198.)

In accordance with the term of the Contract that GMW would receive "10% of the amount Atlass would receive from a St. Agnes Transaction (see above example) (to be paid only if a Transaction effects with a GMW prospective source ... of capital)[,]" GMW also sought 10% of the $2,500,000 that was loaned to Howell, or $250,000. (*See, e.g.,* N.T., Vol. 2, 158-60.) GMW argued it was entitled to be compensated as such, in part, because "the word 'amount' was not defined in any limited way, and any type of capital, including any form of debt capital, was clearly subsumed by the term 'amount'" and "Mr. Steven Grant (President of Grant Williams, LP; the FINRA broker dealer where Weinberg is a registered representative) testified that debt is always considered a form of capital." (Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 58 (citations to the record omitted).) Atlass and his affiliates, on the other hand, argued GMW was "not entitled to any monetary compensation in connection with the $2,500,000 loan because

10

the loan was not a capital-raising event." (Defs.' Proposed Findings of Fact and Conclusions of Law ¶149.) Moreover, Atlass and his affiliates argued GMW was not entitled to any monetary compensation in connection with the $2,500,000 loan because "[t]he $2,500,000 loan from Iron Point to Howell was debt"; Atlass did not believe capital included debt under the contract; and Weinberg's testimony on the issue was not credible. (*Id.* at ¶¶ 131-40, 148-49.)

While Baird had been formally engaged by Howell on November 14, 2011, it was not until April 20, 2012 that GMW entered into a written fee-splitting arrangement with Baird (the "GMW-Baird Agreement"). (Pl.'s Ex. 30.) The GMW-Baird Agreement stated "Baird shall pay GMW a fee of twenty-five (25%) of Net Fees." (*Id.* at p.2 ¶3.) The GMW-Baird Agreement further included certain acknowledgments regarding the fact that GMW had already entered into a separate compensation agreement with Atlass. Specifically, it was acknowledged that GMW was contracted to receive additional compensation, "(i.e., GMW shall be paid by Mr. Steven Atlass and his Affiliates ('Atlass') 10% of the proceeds ... which Atlass receives by way of the JV Formation; additionally, GMW is contracted by Atlass to receive a 25% position in the general partnership of [Howell and/or Haskell]." (*Id.* at pp. 1-2.)

Prior to the spring of 2012, Weinberg did not tell Baird that GMW was already contracted to receive compensation directly from Atlass in connection with a Northeastern Hospital and/or St. Agnes Hospital Transaction. (N.T., Vol. 1, 180-82; N.T., Vol. 2, 64-65.) Before Baird learned from Atlass that GMW was already contracted to receive compensation directly from Atlass, Baird had agreed to split the fees so that GMW would get 50% of the net revenues Baird received from any Transaction. (N.T., Vol. 1, 91-92, 180-82.)

Upon learning Weinberg had not disclosed GMW's pre-existing compensation agreement with Atlass, Baird reduced the fee splitting agreement so that GMW would only get 25% of the

11

net revenues Baird received from any Transaction. (N.T., Vol. 1, 180-82; N.T., Vol. 2, 45.) As a result of the non-disclosure, Goldberg testified Weinberg was "disingenuous" and engaged in an "inappropriate form of business dealings ... ." (N.T., Vol. 1, 182.)

Prior to the bench trial and the filing of its complaint, GMW had already received $108,000 in compensation under the Contract and the GMW-Baird Agreement in connection with the St. Agnes Hospital Transaction.[2] Following the conclusion of the bench trial, this court issued findings of fact and conclusions of law regarding any additional compensation GMW may have been due under the Contract.

Regarding whether GMW was entitled to 10% of the $2.5 million Iron Point loaned to Howell, this court concluded GMW was not entitled to such additional compensation because the $2.5 million Iron Point loaned to Howell was debt. In reaching that conclusion, we noted: (1) the Contract provides GMW would be entitled to "10% of the amount Atlass would receive from a St. Agnes Transaction (see above example) (to be paid only if a Transaction effects with a GMW prospective source (or sources) of capital) ... "; (2) the example the Contract references, however, then provides the amount for purposes of the 10% is "less debt"; and (3) the identical compensation structure for Northeastern Hospital also specifically provides the amount for purposes of the "10% of any funds Atlass receives" is "net of debt." Thus, while having determined Iron Point was a GMW prospective source of capital, this court concluded pursuant to the unambiguous terms of the Contract, GMW was not entitled to the additional $250,000 in compensation as the funding Howell/Atlass received from Iron Point was debt in the form of a loan.

---

[2] This compensation was paid either directly to GMW or to its broker-dealer, Grant Williams.

This court, however, did conclude GMW was entitled to a 25% interest in Krebs, because: (1) the Contract provided GMW would be entitled to "25% of the GP in the entity that controls St. Agnes ... if a Transaction effects with a GMW prospective source ... of capital[]"; (2) a Transaction effected with a GMW prospective source of capital, Iron Point; and (3) while the Board of Managers of St. Agnes MOB, LLC has the ultimate authority and control over St. Agnes Hospital, Howell as its managing member controls St. Agnes Hospital within the meaning of the Contract by virtue of its responsibility for implementing the decisions of the Board and for conducting the day-to-day- business and affairs of the company. As such, this court concluded GMW was entitled to a 25% interest in the general partner of Howell (the entity which controls St. Agnes Hospital within the meaning of the Contract) and that general partner is Krebs.

On October 8, 2014, GMW filed a timely motion for post-trial relief. In its motion, GMW argued "[t]his [c]ourt should clarify its decision under Rule 227.1 to award ... 25% of the promote [or carried interest in the project] to Plaintiff as part of its interest in Krebs." (Pl.'s Post-Trial Mot. ¶ 2.) GMW also argued this court "imported a term from the NE Hospital compensation agreement ('net of debt and costs') into the St. Agnes Hospital transaction, where Plaintiff's compensation on the St. Agnes Hospital transaction never included the 'net of debt' term." (Id. ¶ 31 (emphasis removed).) As such, GWM argued this court erred in not awarding it a "10% fee on [the] $2,500,000 transaction ... ." (Id. at ¶ 5.)

On November 7, 2014, Defendants filed a response in opposition to Plaintiff's motion for post-trial relief. Therein, Defendants argued "[]this [c]ourt need not 'clarify' its decision, which clearly states both [P]laintiff's entitlement to only a 25% beneficial interest in Krebs and the basis for that determination—the unambiguous terms of the [Contract]." (Defs.' Resp. ¶ 2.) Citing *Jarl Investment, L.P. v. Fleck*, 937 A.2d 1113 (Pa. Super. Ct. 2007), among others,

13

Defendants also argued "[a] court should not look at a single sentence or even provision of agreement in isolation to determine if an ambiguity exists, but should look to the entire agreement." (Defs.' Resp. ¶ 4.) As such, Defendants argued "[this] [c]ourt correctly found that no ambiguity existed, as the compensation provision unambiguously provides that [P]laintiff is not entitled to 10% o[n] amounts received by [Defendants] as debt" as "there was one [Contract] that governed compensation for both hospitals" and "the reference in the St. Agnes Hospital provision to the example above, which was for the North East Hospital compensation structure, included a deduction for debt and costs, demonstrating the parties' intent that the St. Agnes Hospital compensation provision also include a deduction for debt and costs." (*Id.* at ¶¶ 4 ,31, 34.)

On December 18, 2014, this court entered an order denying GMW's motion for post-trial relief. Thereafter, GMW filed a timely notice of appeal and this court ordered it file a Pa. R. App. P. 1925(b) statement. In its 1925(b) statement, Plaintiff set forth the following four complaints of error:

1. The Trial Court erred in failing to enter a specific declaration concerning Plaintiff's rights and interest in the "promote" with respect to the St. Agnes transaction, where: (a) the Court recognized the importance of the "promote" to the parties; (b) undisputed extrinsic evidence existed to support Plaintiff's interest in the "promote;" and (c) the Court only awarded Plaintiff an interest in Krebs ... without any declaration concerning Plaintiff's rights to the "promote," thereby permitting Defendant to manipulate the disbursement of "promote" money (including but not limited to altering the entity types in the St. Agnes Transaction) such that Krebs receives only a minimal amount and Defendant[s] avoid[] having to pay Plaintiff his share of the "promote" money.

2. The Trial Court erred in ruling that the terms of [the] parties' agreement concerning Plaintiff's entitlement to $250,000 from the St. Agnes Transaction was clear and unambiguous, where Plaintiff satisfied the conditions precedent to its receiving the $250,000, and, in construing such terms, the Court was required to borrow and insert clauses from other sections of the agreement to support its conclusion that Plaintiff was not entitled to receive $250,000 from the St. Agnes Transaction.

14

3.      The Trial Court erred in failing to award Plaintiff $250,000 based on the "amount" received by Defendants in the St. Agnes Transaction, where: (a) all "debt" considerations were irrelevant to the St. Agnes Transaction because the provisions in the agreement relating to Plaintiff's payment entitlements from the St. Agnes Transaction did not contain a term allowing for "debt" to reduce Plaintiff's entitlements and the Court found that a capital-raising event took place; (b) even the inapplicable "debt" terms which the Court borrowed from other provisions in the agreement not relating to the St. Agnes Transaction called for using pre-existing debt of which the St. Agnes Transaction had none; and (c) there was no genuine debt from the St. Agnes Transaction which could be used to reduce Plaintiff's $250,000 payment entitlement.

4.      The Trial Court erred in construing the agreement of the parties against Plaintiff contrary to the doctrine of *contra proferentem* such that it failed to award Plaintiff $250,000 pursuant to the St. Agnes Transaction where the agreement was drafted by ... Defendants with the assistance of counsel and Plaintiff had no counsel.

(Pl.'s 1925(b) Statement ¶¶ 1-4 (emphasis altered).)

## II.    DISCUSSION

All of GMW's complaints of error relate to this court's interpretation of the Contract. "When interpreting a contract, the court's paramount goal is to ascertain and give effect to the intent of the parties ... ." *Bethlehem Steel Corp. v. MATX, Inc.*, 703 A.2d 39, 42 (Pa. Super. Ct. 1997) (quotations omitted). In interpreting a written contract, "the intent of the parties is the writing itself." *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004). In interpreting such a contract, "each and every part of it must be taken into consideration and given effect, if possible, and the intention of the parties must be ascertained from the entire instrument." *Bethlehem Steel*, 703 A.2d at 42 (quotations omitted).

"If left undefined, the words of a contract are to be given their ordinary meaning." *Kripp*, 849 A.2d at 11633. "When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself." *Id.* "The intent of the parties ... is deemed to be embodied in 'what the agreement manifestly expressed, not what the parties may

15

have silently intended.'" *Greater Nanticoke Area Sch. Dist. v. Greater Nanticoke Area Educ. Ass'n*, 760 A.2d 1214, 1219 (Pa. Commw. Ct. 2000), *quoting Delaware County v. Delaware County Prison Employees Indep. Union*, 713 A.2d 1135, 1138 (Pa. 1998).

When, however, "the words used in a contract are ambiguous, a court may examine the surrounding circumstances to ascertain the intent of the parties." *Bethlehem Steel*, 703 A.2d at 42, *quoting Halpin v. Lasalle Univ.*, 639 A.2d 37, 39 (Pa. Super. Ct. 1994). "When determining whether a contract is ambiguous, a court must view the contract as a whole and not in discrete units." *Bethlehem Steel*, 703 A.2d at 42, *quoting Halpin*, 639 A.2d 37 at 39. "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Kripp*, 849 A.2d at 1163. "When ... an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances." *Id.*

First, GMW complains this court:

> erred in failing to enter a specific declaration concerning Plaintiff's rights and interest in the "promote" with respect to the St. Agnes Transaction, [because] (a) the [c]ourt recognized the importance of the "promote" to the parties; (b) undisputed extrinsic evidence existed to support Plaintiff's interest in the "promote;" and (c) the [c]ourt only awarded Plaintiff an interest in Krebs ... without any declaration concerning Plaintiff's rights to the "promote," thereby permitting Defendant to manipulate the disbursement of "promote" money (including but not limited to altering the entity types in the St. Agnes Transaction) such that Krebs receives only a minimal amount and Defendant[s] avoid[] having to pay Plaintiff his share of the "promote" money.

(Pl.'s 1925(b) Statement ¶ 1.) As explained by Weinberg at trial, "[g]enerally speaking, in ... real estate limited partner/general partner structures, there is a carried interest or promote or what's also known as a profit share whereby ... a person who's putting the deal together[] can share in the upside as the property or the entity becomes successful" and the limited partners

16

have been paid back with interest. (N.T., Vol. 1, 68-69.)

As a preliminary matter, this court did not err in failing to enter a specific declaration concerning Plaintiff's rights and interest in the promote because Plaintiff did not ask for such a specific declaration in its count for declaratory relief in its complaint, nor in its proposed findings of fact and conclusions of law. The reason Plaintiff did not ask for such a declaration was because it was seeking a 25% beneficial interest in Howell itself, in part because it argued Atlass controls whether Krebs would receive any of the promote. (*See, e.g.*, Pl.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 75, 94.) The Contract, however, only provided GMW was entitled to "25% of the GP in the entity that controls St. Agnes [Hospital]" and made no mention of the "promote." As such, this court correctly concluded GMW was only entitled to a 25% beneficial interest in Krebs pursuant to the unambiguous terms of the Contract and as a primary matter made no error in failing to enter a specific declaration concerning Plaintiff's rights and interest in the "promote."

As this was a breach of contract case, this court was focused on the language of the parties' written agreement. That agreement provided GMW would be entitled to "25% of the GP in the entity that controls St. Agnes [Hospital]" and made no mention of a "promote." While Defendants argued Plaintiff was not entitled to a 25% interest in any Atlass affiliate because it is the Board of Managers of St. Agnes MOB, LLC that "controls" St. Agnes, and the Board does not have a general partner, this court concluded Howell as the managing member also has a significant amount of control over the business by virtue of its responsibility for implementing the decisions of the Board and for conducting the day-to-day business and affairs of the company. (*See* Findings of Fact and Conclusions of Law, at 21 ¶¶ 55-56, *citing* Black's Law Dictionary (9th ed. 2009) (defining control as "exercis[ing] power or influence over ... .").) As

17

such, this court concluded Howell controls St. Agnes Hospital within the meaning of the Contract, and the Contract provided GMW was entitled to a 25% interest in the general partner of Howell, which is Krebs.

In reaching this conclusion, this court was fully aware of Plaintiff's argument that it was entitled to 25% of Howell itself because Atlass controls whether Krebs would receive any of the promote. However, as the terms of the Contract were clear and unequivocal that Plaintiff is only entitled to "25% of the GP in the entity that controls St. Agnes [Hospital]" and made no mention of a promote, this court was not examining the surrounding circumstances to ascertain the intent of the parties regarding the promote, *see, e.g., Bethlehem Steel*, 703 A.2d at 42 (stating, "[w]hen the words used in a contract are ambiguous, a court may examine the surrounding circumstances to ascertain the intent of the parties."), nor "recognize[ing] the importance of the 'promote' to the parties ... " as asserted by Plaintiff, (Pl.'s 1925(b) Statement ¶ 1). Rather, in reaching its conclusion that Plaintiff was only entitled to a 25% interest in Krebs, it was enforcing the clear and unequivocal terms of the Contract the parties actually entered into.

Moreover, even if the provision was ambiguous and required the use of extrinsic evidence, *see, e.g., Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc.*, 77 A.3d 1, 6 (Pa. Super. Ct. 2013) (stating before the court admits parol evidence "to explain or clarify or resolve" an ambiguity, the court "first analyze[s] the contract to determine whether an ambiguity exists requiring the use of extrinsic evidence"), it is not true undisputed extrinsic evidence existed to support Plaintiff's interest in the promote. Rather, what the extrinsic evidence showed in this regard was that the parties intended for GMW to receive a 25% interest in a newly formed general partnership that would control St. Agnes Hospital after a Transaction was affected, not a 25% interest in the existing Howell Acquisition Partners, L.P., which Atlass formed to purchase

18

the hospital in the first place. (*See* Findings of Fact and Conclusions of Law, at 2 ¶ 10, 21-22 ¶¶ 59.) However, as this court concluded in its findings of fact and conclusions of law, by the plain and unequivocal terms of the Contract, GMW assumed the risk of whether or not this would happen. (*See Id.* at 21-22 ¶¶ 59-61 (noting it was reasonably foreseeable a private equity investor might dictate the deal be structured as a limited liability company rather than a limited partnership).) And it did not happen as Iron Point—without any manipulation on the part of Atlass—decided the new entity would be a limited liability company as opposed to a limited partnership with a general partner. (*Id.* at 21-22 ¶¶ 59-60.)

Additionally, the extrinsic evidence also showed that as part of GMW's fee splitting agreement with Baird, GMW acknowledged it was "contracted by Atlass to receive a 25% position in the general partnership of the Company." (Pl.'s Ex. 30 at ¶ 3.) As relevant here, the term "Company" was defined in the GMW-Baird Agreement as Howell whose general partner is Krebs. Thus, the extrinsic evidence also showed GMW understood its compensation was never to be a 25% interest in Howell itself. Therefore, rather than there being undisputed extrinsic evidence supporting GMW having a 25% interest in the promote and a specific declaration of the same, what the extrinsic evidence actually showed was that GMW's compensation was to be a 25% interest in either Krebs or a newly formed "Howell GP," regardless of whom may receive or control the promote, and Weinberg's testimony to the contrary was self-serving and lacked credibility, (*see, e.g.,* N.T., Vol. 1., 68 (discussing a July 11, 2011 letter to an investor, which provided "Howell becomes the GP (Howell GP) of the JV with the following approximate promotes/carried interests ... [,]" and stating that was generally the structure that was ultimately used to close the deal with Iron Point)).

In sum, the unambiguous terms of the Contact entitled Plaintiff to a 25% beneficial

19

interest in Krebs, but not a specific declaration that it is entitled to 25% of the "promote." Moreover, even if it is determined extrinsic evidence is relevant to the issue, the extrinsic evidence is not undisputed and this court's decision that Plaintiff is not entitled to a specific declaration that it is entitled to 25% of the promote should be affirmed on appeal. *See generally Keystone Dedicated*, 77 A.3d at 6-7 (stating that while an appellate court has *de novo* review over a lower court's interpretation of a contract, "resolution of conflicting parol evidence relevant to what the parties intended by [an] ambiguous provision is for the trier of fact.")

Next, Plaintiff complains this court "erred in ruling that the terms of [the] parties' agreement concerning [its] [lack of an] entitlement to $250,000 from the St. Agnes Transaction was clear and unambiguous[] where ... the [c]ourt was required to borrow and insert clauses from other sections of the agreement to support its conclusion ... Plaintiff was not entitled to receive $250,000 from the St. Agnes Transaction." (Pl.'s 1925(b) Statement ¶ 2.) The court disagrees.

As stated above, "[w]hen determining whether a contract is ambiguous, a court must view the contract as a whole and not in discrete units ••• and the intention of the parties must be ascertained from the entire instrument." *Bethlehem Steel*, 703 A.2d at 42 (quotations omitted). Here, there was one agreement that governed compensation for Transactions involving both hospitals—the Contract—and there was no error in looking at the entire instrument to ascertain the intentions of the parties regarding that compensation.

Moreover, there was no error in determining that "debt" was relevant to whether GMW was entitled to the tier-two compensation for both Northeastern Hospital ("10% of any funds Atlass receives from a[] NE Hospital Transaction") and St. Agnes Hospital ("10% of the amount Atlass would receive from a St. Agnes Transaction"). (*Cf.* Pl.'s 1925(b) Statement ¶ 3 (stating

20

the court erred in failing to award $250,000 because "all 'debt' considerations were irrelevant to the St. Agnes Transaction because the provisions in the agreement relating to ... the St. Agnes Transaction did not contain a term allowing for 'debt' to reduce Plaintiff's [compensation] ..." like the provisions in the agreement relating to Northeastern Hospital did).)

As relevant here, the Contract set forth identical compensation structures for both Northeastern Hospital and St. Agnes Hospital, specifically providing:

*COMPENSATION*

**NE HOSPITAL**

1) 3% of a NE Hospital Transaction (irrespective of who identifies the source of capital; i.e. GMW or Atlass);
2) 10% of any funds Atlass receives from a[] NE Hospital Transaction (net of debt and costs) (to be paid only if a Transaction effects with a GMW prospective source (or sources) of capital, or if a Transaction effects by way of a new general partner of NE Hospital, and Atlass receives funds from such Transaction); and
3) 25% of the general partnership ("GP") of the entity controlling NE Hospital (to be granted only if a Transaction effects with a GMW prospective source (or sources) of capital[)].

By way of example, should GMW raise $20 million dollars in a joint venture ("JV") structure for NE Hospital from a prospective source of capital, GMW's compensation will be as follows:

1) 3% of $20 million (i.e. $600,000.00);
2) 10% of what Atlass receives (e.g. $20,000,000 less debt of $12 million, less $2 million buyout of partners, less expenses); the net amount of $6 million would equal a $600,000 fee payable to GMW; and
3) 25% of the GP of the entity controlling ... NE Hospital.

**ST AGNES HOSPITAL**

•••

1) 3% of the Transaction amount (irrespective of who identifies the source of capital; i.e. GMW or Atlass);
2) 10% of the amount Atlass would receive from a St. Agnes Transaction (see above example) (to be paid only if a Transaction effects with a GMW prospective source (or sources) of capital); and
3) 25% of the GP in the entity that controls St. Agnes (to be granted only if a Transaction effects with a GMW prospective source (or sources) of

21

capital).

(Pl.'s Ex. 1, p. 2.)

The Contract specifically enumerated the same three types of compensation for both a Northeastern Hospital and a St. Agnes Hospital Transaction. The first type of compensation, or tier-one compensation, was 3% of a Northeastern Hospital or St. Agnes Hospital Transaction. The second type of compensation, or tier-two compensation, was 10% of the amount or any funds Atlass would receive from a Northeastern Hospital or St. Agnes Hospital Transaction. And the third type of compensation, or tier-three compensation, was 25% of the GP of the entity that controlled Northeastern Hospital or St. Agnes Hospital following a Transaction.

At issue here is whether GMW was entitled to any tier-two compensation where the amount Atlass received from the St. Agnes Hospital Transaction was debt. While the St. Agnes Hospital provision did not specifically include net of debt and costs in parentheses like the Northeastern Hospital provision did, the St. Agnes Hospital provision for tier-two compensation specifically referenced in parentheses the example above, which was for the Northeastern Hospital compensation structure and specifically provided the amount for purposes of the 10% was "less debt" and "less expenses." The fact that the example the St. Agnes Hospital provision expressly referenced provided the amount for purposes of the 10% was "less debt" and "less expenses," coupled with the fact that the nearly identical Northeastern Hospital provision for tier-two compensation specifically provided in parentheses the amount for purposes of the "10% of any funds Atlass receives" is "net of debt and cost," led this court to conclude the parties unambiguously intended the St. Agnes Hospital provision for tier-two compensation was also net of debt and costs and the Contract unambiguously provided GMW was not entitled to the 10% compensation where the amount Atlass received was debt. This is the only reasonable

22

construction of the Contract; is well supported by viewing the Contract as a whole; and should be affirmed. *See generally Bethlehem Steel*, 703 A.2d at 42 (stating that in construing a contract, "[t]he intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct [to] the parties, bearing in mind the objects manifestly to be accomplished.").[3]

Next, Plaintiff complains even if debt was relevant to determining whether it was entitled to tier-two compensation for the St. Agnes Hospital Transaction, (1) only "pre-existing debt" could be excluded and (2) "there was no genuine debt from the St. Agnes [Hospital] Transaction which could be used to reduce [its] $250,000 payment entitlement." (Pl.'s 1925(b) Statement ¶ 3.) Regarding the first complaint, Plaintiff argued in its post-trial motion that "[t]he example in the compensation agreement was used to capture only the existing debt that was tied to the property ... at the time of the closing of a [T]ransaction." (Pl.'s Post-Trial Mot. ¶ 42.) Regarding the second complaint, Plaintiff argued "[i]n actual fact, the ... $2.5 million distribution to Howell was not truly a loan, because the interest was to be (and was) paid for by the cash flow/distributions of and from St. Agnes MOB, LLC and the money was only briefly 'loaned,' and the loan was for tax reasons." (*Id.* at ¶ 44.)

The problem with Plaintiff's first complaint, however, is that there was no evidence, either in the unambiguous Contract or in the record (assuming extrinsic evidence was relevant), that the "net of debt" and "less debt" terms referred to funds used to pay off existing debt, rather than new debt provided as part of a Transaction. The problem with Plaintiff's second complaint

---

[3]     Even if the Superior Court concludes this provision is ambiguous (which it is not), this court also determined the extrinsic evidence presented at trial demonstrated the parties intended tier-two compensation for any St. Agnes Hospital Transaction was net of debt and costs. As such, this court's decision that Plaintiff is not entitled to receive tier-two compensation for the St. Agnes Hospital Transaction should still ultimately be affirmed.

23

is very similar.

At trial, Weinberg claimed the $2.5 million was structured as a loan on his recommendation to reduce Atlass' tax burden or, alternatively, by Atlass to avoid paying GMW 10%. (*See, e.g.,* N.T., Vol. 1, 153-56.) This court as the fact finder, however, found neither argument to be credible and, rather, determined it was Iron Point that dictated the $2.5 million would be structured as a loan in order to provide itself with more protection. Nor does the fact that the interest on the $2.5 million loan "was to be (and was) paid for by the cash flow/distributions of and from St. Agnes MOB, LLC and the money was only briefly 'loaned'" support Plaintiff's contention that "the ... $2.5 million distribution to Howell was not truly a loan ... ." (Pl.'s Post-Trial Mot. ¶ 44.) Rather, the $2.5 million loan from Iron Point to Howell was a legitimate loan/debt and the fact that some or all of it was paid off through a St. Agnes MOB, LLC refinancing after the St. Agnes Hospital Transaction does not somehow retroactively convert it into equity at the time of the Transaction, and Plaintiff pointed to no law to the contrary.

Finally, GMW complains "[this] [c]ourt erred in construing the agreement of the parties against Plaintiff contrary to the doctrine of *contra proferentem* such that it failed to award Plaintiff $250,000 pursuant to the St. Agnes Transaction where the agreement was drafted by the Defendants with the assistance of counsel and Plaintiff had no counsel." (Pl.'s 1925(b) Statement ¶ 4 (emphasis altered).) The court disagrees for the following two reasons.

First, the doctrine of *contra proferentem* allows courts to construe an ambiguity in a contract against the drafter. *See, e.g., Sun Co. v. Pennsylvania Tpk. Comm'n,* 708 A.2d 875, 878-79 (Pa. Commw. Ct. 1998), *citing* Restatement (Second) of Contracts § 206 ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is

24

generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds."); *Redevelopment Auth. of City of Philadelphia v. Ins. Co. of N. Am.*, 675 A.2d 1256, 1257 (Pa. Super. Ct. 1996) (providing that "[w]here a provision of a [contract] is ambiguous, it should be construed against the ... drafter of the document[,] but where the provision "is clear and unambiguous, the court must give effect to its plain and ordinary meaning."). Here, the Contract unambiguously provided that GMW was not entitled to any tier-two compensation where the amount Atlass received from the St. Agnes Hospital Transaction was debt. As such, the doctrine of *contra proferentem* was inapplicable to the court's interpretation of the Contract and there was no error as Plaintiff claims.

Second, even if the provision was ambiguous, courts are reluctant to apply the doctrine where the agreement is between sophisticated parties or has been negotiated. *See, e.g., Kozura v. Tulpehocken Area Sch. Dist.*, 791 A.2d 1169, 1175 n.8 (Pa. 2002) (stating "[t]he principle that a contractual ambiguity is to be construed against the drafter does not apply where, as here, the contract is the result of the joint efforts of negotiators."); *Eastcoast Equip. Co. v. Maryland Cas. Co.*, 218 A.2d 91, 92 (Pa. Super. Ct. 1966) (stating there would little to no reason to apply the doctrine of *contra proferentem* to an agreement between two large companies who both had been advised by competent counsel); *Williston on Contracts* § 32:12 (stating "[a]pplication of the rule may be further limited by the degree of sophistication of the contracting parties or the degree to which the contract was negotiated."). Here, while Plaintiff chose to negotiate the Contract without the aid of an attorney, Plaintiff and its principal was a self-described sophisticated party and the Contract was the result of substantial negotiations between Weinberg and Atlass, with Atlass providing the first draft and Weinberg making substantial revisions thereto. As such, even if the Contract were ambiguous, the doctrine of *contra proferentem* was still inapplicable to the

25

court's interpretation of the Contract and there was no error as Plaintiff claims.

While Plaintiff may now regret negotiating and drafting the Contract on its own, Plaintiff is a sophisticated party and should be held to the plain and unambiguous terms of the Contract it negotiated and actually entered into. Under the plain and unambiguous terms of that Contract and the evidence presented at trial, Plaintiff was not entitled to any tier-two compensation where the amount Atlass received from the St. Agnes Hospital Transaction was debt. The $2.5 million loan was a legitimate debt dictated by Iron Point, and not the result of any manipulation on the part of Atlass to avoid paying Plaintiff 10%. This court's decision that Plaintiff is not entitled under the Contract to additional compensation in the amount of $250,000 should, therefore, also be affirmed on appeal.

BY THE COURT:

McINERNEY, J

26